**Kerry ELLISON, Plaintiff–Appellant,**

v.

**Nicholas F. BRADY,\* Secretary of the Treasury, Defendant–Appellee.**

No. 89–15248.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 19, 1990.

Decided Jan. 23, 1991.

Dissent Amended Feb. 5, 1991.

ing the public with a right to obtain copies of such disclosure documents).

\* Nicholas F. Brady is substituted for James A. Baker III as Secretary of the Treasury, pursuant

to Rule 43(c)(1) of the Federal Rules of Appellate Procedure.

Terrence A. Beard, Oakland, Cal., for plaintiff-appellant.

Stephen L. Schirle, Asst. U.S. Atty., San Francisco, Cal., for defendant-appellee.

Before BEEZER and KOZINSKI, Circuit Judges, and STEPHENS,[**] District Judge.

BEEZER, Circuit Judge:

Kerry Ellison appeals the district court's order granting summary judgment to the Secretary of the Treasury on her sexual harassment action brought under Title VII of the Civil Rights Act of 1964. 42 U.S.C.

§ 2000e (1982). This appeal presents two important issues: (1) what test should be applied to determine whether conduct is sufficiently severe or pervasive to alter the conditions of employment and create a hostile working environment, and (2) what remedial actions can shield employers from liability for sexual harassment by co-workers. The district court held that Ellison did not state a prima facie case of hostile environment sexual harassment. We reverse and remand.

Both issues require a detailed analysis of the facts, which we consider in the light most favorable to Ellison, the non-moving party. *Sierra Club v. Penfold*, 857 F.2d 1307, 1320 (9th Cir.1988). We review summary judgments de novo. *Id.*

I

Kerry Ellison worked as a revenue agent for the Internal Revenue Service in San Mateo, California. During her initial training in 1984 she met Sterling Gray, another trainee, who was also assigned to the San Mateo office. The two co-workers never became friends, and they did not work closely together.

Gray's desk was twenty feet from Ellison's desk, two rows behind and one row over. Revenue agents in the San Mateo office often went to lunch in groups. In June of 1986 when no one else was in the office, Gray asked Ellison to lunch. She accepted. Gray had to pick up his son's forgotten lunch, so they stopped by Gray's house. He gave Ellison a tour of his house.

Ellison alleges that after the June lunch Gray started to pester her with unnecessary questions and hang around her desk. On October 9, 1986, Gray asked Ellison out for a drink after work. She declined, but she suggested that they have lunch the following week. She did not want to have lunch alone with him, and she tried to stay away from the office during lunch time. One day during the following week, Gray

---

[**] The Honorable Albert Lee Stephens, Senior United States District Judge for the Central District of California, sitting by designation.

uncharacteristically dressed in a three-piece suit and asked Ellison out for lunch. Again, she did not accept.

On October 22, 1986 Gray handed Ellison a note he wrote on a telephone message slip which read:

I cried over you last night and I'm totally drained today. I have never been in such constant term oil (sic). Thank you for talking with me. I could not stand to feel your hatred for another day.

When Ellison realized that Gray wrote the note, she became shocked and frightened and left the room. Gray followed her into the hallway and demanded that she talk to him, but she left the building.

Ellison later showed the note to Bonnie Miller, who supervised both Ellison and Gray. Miller said "this is sexual harassment." Ellison asked Miller not to do anything about it. She wanted to try to handle it herself. Ellison asked a male co-worker to talk to Gray, to tell him that she was not interested in him and to leave her alone. The next day, Thursday, Gray called in sick.

Ellison did not work on Friday, and on the following Monday, she started four weeks of training in St. Louis, Missouri. Gray mailed her a card and a typed, single-spaced, three-page letter. She describes this letter as "twenty times, a hundred times weirder" than the prior note. Gray wrote, in part:

I know that you are worth knowing with or without sex.... Leaving aside the hassles and disasters of recent weeks. I have enjoyed you so much over these past few months. Watching you. Experiencing you from O so far away. Admiring your style and elan.... Don't you think it odd that two people who have never even talked together, alone, are striking off such intense sparks ... I will [write] another letter in the near future.[1]

Explaining her reaction, Ellison stated: "I just thought he was crazy. I thought he was nuts. I didn't know what he would do next. I was frightened."

She immediately telephoned Miller. Ellison told her supervisor that she was frightened and really upset. She requested that Miller transfer either her or Gray because she would not be comfortable working in the same office with him. Miller asked Ellison to send a copy of the card and letter to San Mateo.

Miller then telephoned her supervisor, Joe Benton, and discussed the problem. That same day she had a counseling session with Gray. She informed him that he was entitled to union representation. During this meeting, she told Gray to leave Ellison alone.

At Benton's request, Miller apprised the labor relations department of the situation. She also reminded Gray many times over the next few weeks that he must not contact Ellison in any way. Gray subsequently transferred to the San Francisco office on November 24, 1986. Ellison returned from St. Louis in late November and did not discuss the matter further with Miller.

After three weeks in San Francisco, Gray filed union grievances requesting a return to the San Mateo office. The IRS and the union settled the grievances in Gray's favor, agreeing to allow him to transfer back to the San Mateo office provided that he spend four more months in San Francisco and promise not to bother Ellison. On January 28, 1987, Ellison first learned of Gray's request in a letter from Miller explaining that Gray would return to the San Mateo office. The letter indicated that management decided to resolve Ellison's problem with a six-month separation, and that it would take additional action if the problem recurred.

After receiving the letter, Ellison was "frantic." She filed a formal complaint alleging sexual harassment on January 30, 1987 with the IRS. She also obtained permission to transfer to San Francisco temporarily when Gray returned.

Gray sought joint counseling. He wrote Ellison another letter which still sought to

---

1. In the middle of the long letter Gray did say "I am obligated to you so much that if you want me to leave you alone I will.... If you want me to forget you entirely, I can not do that."

maintain the idea that he and Ellison had some type of relationship.[2]

The IRS employee investigating the allegation agreed with Ellison's supervisor that Gray's conduct constituted sexual harassment. In its final decision, however, the Treasury Department rejected Ellison's complaint because it believed that the complaint did not describe a pattern or practice of sexual harassment covered by the EEOC regulations. After an appeal, the EEOC affirmed the Treasury Department's decision on a different ground. It concluded that the agency took adequate action to prevent the repetition of Gray's conduct.

Ellison filed a complaint in September of 1987 in federal district court. The court granted the government's motion for summary judgment on the ground that Ellison had failed to state a prima facie case of sexual harassment due to a hostile working environment. Ellison appeals.

## II

Congress added the word "sex" to Title VII of the Civil Rights Act of 1964[3] at the last minute on the floor of the House of Representatives. 110 Cong.Rec. 2,577–2,-584 (1964). Virtually no legislative history provides guidance to courts interpreting the prohibition of sex discrimination. In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that sexual harassment constitutes sex discrimination in violation of Title VII.

Courts have recognized different forms of sexual harassment. In "quid pro quo" cases, employers condition employment benefits on sexual favors. In "hostile environment" cases, employees work in offensive or abusive environments.[4] A. Larson, *Employment Discrimination* § 41.61 at 8–151 (1989). This case, like *Meritor,* involves a hostile environment claim.

The Supreme Court in *Meritor* held that Mechelle Vinson's working conditions constituted a hostile environment in violation of Title VII's prohibition of sex discrimination. Vinson's supervisor made repeated demands for sexual favors, usually at work, both during and after business hours. Vinson initially refused her employer's sexual advances, but eventually acceded because she feared losing her job. They had intercourse over forty times. She additionally testified that he "fondled her in front of other employees, followed her into the women's restroom when she went there alone, exposed himself to her, and even forcibly raped her on several occasions." *Meritor,* 477 U.S. at 60, 106 S.Ct. at 2402. The Court had no difficulty finding this environment hostile. *Id.* at 67, 106 S.Ct. at 2405–06.

 Since *Meritor,* we have not often reached the merits of a hostile environment sexual harassment claim. In *Jordan v. Clark,* 847 F.2d 1368, 1373 (9th Cir.1988), *cert. denied sub nom., Jordan v. Hodel,* 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989), we explained that a hostile environment exists when an employee can show (1) that he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature,[5] (2) that this conduct was unwel-

**2.** It is unclear from the record on appeal whether Ellison received the third letter.

**3.** That statute makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1982).

**4.** Some courts have entertained causes of action for sexual harassment which do not fall squarely within the quid pro quo cases or the hostile environment cases. For example, some courts have classified harassment based on the victim's gender as sexual harassment where the conduct or language is not sexual in nature. *See, e.g., Hall v. Gus Construction Co.,* 842 F.2d 1010, 1014 (8th Cir.1988). Our examples are illustrative and not exclusive because we realize that sexual harassment is a rapidly expanding area of the law.

**5.** Here, the government argues that Gray's conduct was not of a sexual nature. The three-page letter, however, makes several references to sex and constitutes verbal conduct of a sexual nature. We need not and do not decide whether a party can state a cause of action for a sexually discriminatory working environment under Title VII when the conduct in question is not sexual. *See Andrews v. City of Philadelphia,* 895

come, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

In *Jordan*, we reviewed for clear error the district court's determination that an employee was not subjected to particular unwelcome advances. *Id.* at 1375. We explained that we will review de novo a district court's final conclusion that conduct is not severe enough or pervasive enough to constitute an abusive environment. *Id.* at n. 7. We affirmed the district court's judgment in *Jordan* because we did not find its factual findings clearly erroneous. *Id.* *See also Vasconcelos v. Meese*, 907 F.2d 111, 112 (9th Cir.1990) (affirming district court's decision that the working environment was not sexually hostile because the district court's factual findings were not clearly erroneous).

We had another opportunity to examine a hostile working environment claim of sexual harassment in *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir.1989). In that case the district court found a hostile working environment where the hotel's male chief of engineering frequently made sexual comments and sexual advances to the maids, and where a female supervisor called her female employees "dog[s]" and "whore[s]." *Id.* at 1508. Upon a de novo review of the facts found by the district court, we agreed that the conduct was sufficiently severe and pervasive to alter the conditions of employment and create a hostile working environment.

## III

The parties ask us to determine if Gray's conduct, as alleged by Ellison, was sufficiently severe or pervasive to alter the conditions of Ellison's employment and create an abusive working environment. The district court, with little Ninth Circuit case law to look to for guidance, held that Ellison did not state a prima facie case of sexual harassment due to a hostile working environment. It believed that Gray's conduct was "isolated and genuinely trivial." We disagree.

We begin our analysis of the third part of the framework we set forth in *Jordan* with a closer look at *Meritor*. The Supreme Court in *Meritor* explained that courts may properly look to guidelines issued by the Equal Employment Opportunity Commission (EEOC) for guidance when examining hostile environment claims of sexual harassment. 477 U.S. at 65, 106 S.Ct. at 2404–05. The EEOC guidelines describe hostile environment harassment as "conduct [which] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3). The EEOC, in accord with a substantial body of judicial decisions, has concluded that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." 477 U.S. at 65, 106 S.Ct. at 2405.

The Supreme Court cautioned, however, that not all harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. For example, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is not, by itself, actionable under Title VII. *Id.* at 67, 106 S.Ct. at 2405. To state a claim under Title VII, sexual harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.*

The Supreme Court drew its limiting language from *Rogers v. E.E.O.C.*, 454 F.2d 234 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), the first case to recognize a hostile racial environment claim under Title VII. The *Rogers* phrasing limits hostile environment claims to cases where conduct alters the conditions of employment and creates an abusive working environment. The EEOC guidelines, drawing upon *Rogers* and other decisions, indicate that sexual harassment violates Title VII where con-

F.2d 1469, 1485 (3d Cir.1990) (conduct need not be sexual); *Hall v. Gus Construction Co.*, 842

F.2d 1010, 1014 (8th Cir.1988) (conduct need not be sexual).

duct creates an intimidating, hostile, or offensive environment *or* where it unreasonably interferes with work performance. 29 C.F.R. § 1604.11(a)(3).

We do not think that these standards are inconsistent. The Supreme Court used the words "abusive" and "hostile" synonymously in *Meritor*. 477 U.S. at 66, 106 S.Ct. at 2405. The *Meritor* Court also approved of and paid detailed attention to the EEOC's guidelines, and it implicitly adopted the EEOC's position that sexual harassment which unreasonably interferes with work performance violates Title VII. Similarly, although we only expressly incorporated the limiting language from *Rogers* in the third part of our framework in *Jordan*, that part also encompasses the EEOC's requirements in 29 C.F.R. § 1604.11(a)(3). Conduct which unreasonably interferes with work performance can alter a condition of employment and create an abusive working environment. *Contra* Pollack, *Sexual Harassment: Women's Experience vs. Legal Definitions*, 13 Harv. Women's Law J. 35, 60 (1990) (arguing that the *Meritor* court opted for the strict standard enunciated in *Rogers* instead of the more lenient EEOC standard).

Although *Meritor* and our previous cases establish the framework for the resolution of hostile environment cases, they do not dictate the outcome of this case. Gray's conduct falls somewhere between forcible rape and the mere utterance of an epithet. 477 U.S. at 60, 67, 106 S.Ct. at 2402, 2405–06. His conduct was not as pervasive as the sexual comments and sexual advances in *Hacienda Hotel*, which we held created an unlawfully hostile working environment. 881 F.2d 1504.

The government asks us to apply the reasoning of other courts which have declined to find Title VII violations on more egregious facts. In *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 212 (7th Cir. 1986), the Seventh Circuit analyzed a female employee's working conditions for sexual harassment. It noted that she was repeatedly propositioned and winked at by her supervisor. When she asked for assistance, he asked "what will I get for it?" Co-workers slapped her buttocks and commented that she must moan and groan during sex. The court examined the evidence to see if "the demeaning conduct and sexual stereotyping cause[d] such anxiety and debilitation to the plaintiff that working conditions were 'poisoned' within the meaning of Title VII." *Id.* at 213. The court did not consider the environment sufficiently hostile. *Id.* at 214.

Similarly, in *Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), the Sixth Circuit refused to find a hostile environment where the workplace contained posters of naked and partially dressed women, and where a male employee customarily called women "whores," "cunt," "pussy," and "tits," referred to plaintiff as "fat ass," and specifically stated, "All that bitch needs is a good lay." Over a strong dissent, the majority held that the sexist remarks and the pin-up posters had only a de minimis effect and did not seriously affect the plaintiff's psychological well-being.

We do not agree with the standards set forth in *Scott* and *Rabidue*,[6] and we choose not to follow those decisions.[7] Neither *Scott's* search for "anxiety and debilitation" sufficient to "poison" a working envi-

---

**6.** We note that the Sixth Circuit has called *Rabidue* into question in at least two subsequent opinions. In *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir.1987), a panel of the Sixth Circuit expressly adopted one of the main arguments in the *Rabidue* dissent, that sexual harassment actions should be viewed from the victim's perspective. In *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 350 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989), the Sixth Circuit once again criticized *Rabidue's* limited reading of Title VII. *See also*

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990) (explicitly rejecting *Rabidue* and holding that derogatory language directed at women and pornographic pictures of women serve as evidence of a hostile working environment).

**7.** We note that unlike this case, the plaintiffs in *Scott* and *Rabidue* alleged that a hostile working environment contributed to their discharge. We need not and do not address how or whether a discharge would alter our analysis.

ronment nor *Rabidue's* requirement that a plaintiff's psychological well-being be "seriously affected" follows directly from language in *Meritor*.[8] It is the harasser's conduct which must be pervasive or severe, not the alteration in the conditions of employment. Surely, employees need not endure sexual harassment until their psychological well-being is seriously affected to the extent that they suffer anxiety and debilitation. *Accord, EEOC Policy Guidance on Sexual Harassment*, 8 Fair Employment Practices Manual (BNA) 405:6681, 6690, n. 20 (March 19, 1990). Although an isolated epithet by itself fails to support a cause of action for a hostile environment, Title VII's protection of employees from sex discrimination comes into play long before the point where victims of sexual harassment require psychiatric assistance.

■ We have closely examined *Meritor* and our previous cases, and we believe that Gray's conduct was sufficiently severe and pervasive to alter the conditions of Ellison's employment and create an abusive working environment. We first note that the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. *See King v. Board of Regents of University of Wisconsin System*, 898 F.2d 533, 537 (7th Cir.1990) ("[a]lthough a single act can be enough, ... generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident.") *Accord Andrews*, 895 F.2d at 1484; *Carrero v. New York City Housing Authority*, 890 F.2d 569, 578 (2d Cir.1989); EEOC Compliance Manual, § 615, ¶ 3112, C at 3243 (CCH 1988). For

example, in *Vance v. Southern Bell Telephone and Telegraph Co.*, 863 F.2d 1503, 1510 (11th Cir.1989), the court held that two incidents in which a noose was found hung over an employee's work station were sufficiently severe to constitute a jury question on a racially hostile environment.

■ Next, we believe that in evaluating the severity and pervasiveness of sexual harassment, we should focus on the perspective of the victim. *King*, 898 F.2d at 537; EEOC Compliance Manual (CCH) § 615, ¶ 3112, C at 3242 (1988) (courts "should consider the victim's perspective and not stereotyped notions of acceptable behavior.") If we only examined whether a reasonable person would engage in allegedly harassing conduct, we would run the risk of reinforcing the prevailing level of discrimination. Harassers could continue to harass merely because a particular discriminatory practice was common, and victims of harassment would have no remedy.

We therefore prefer to analyze harassment from the victim's perspective. A complete understanding of the victim's view requires, among other things, an analysis of the different perspectives of men and women. Conduct that many men consider unobjectionable may offend many women. *See, e.g., Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898 (1st Cir. 1988) ("A male supervisor might believe, for example, that it is legitimate for him to tell a female subordinate that she has a 'great figure' or 'nice legs.' The female subordinate, however, may find such comments offensive"); *Yates*, 819 F.2d at 637, n. 2 ("men and women are vulnerable in different ways and offended by different behavior"). *See also* Ehrenreich, *Pluralist Myths and Powerless Men: The Ideology of Reasonableness in Sexual Harassment*

---

8. As we explained earlier, the Supreme Court in *Meritor* implicitly adopted the EEOC's position that sexual harassment which unreasonably interferes with work performance violates Title VII. 477 U.S. at 65, 106 S.Ct. at 2404–05. Conduct can unreasonably interfere with work performance without causing debilitation and without seriously affecting an employee's psychological well-being. Perhaps the confusion in *Scott* and *Rabidue* flows from a quotation in *Meritor* from *Rogers*. In its analysis, the *Rogers* court

explained that "[o]ne can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Meritor*, 477 U.S. at 66, 106 S.Ct. at 2405, *quoting Rogers*, 454 F.2d at 238. The *Rogers* court did *not* hold that a hostile environment only exists when the emotional and psychological stability of workers is completely destroyed.

*Law*, 99 Yale L.J. 1177, 1207–1208 (1990) (men tend to view some forms of sexual harassment as "harmless social interactions to which only overly-sensitive women would object"); Abrams, *Gender Discrimination and the Transformation of Workplace Norms*, 42 Vand.L.Rev. 1183, 1203 (1989) (the characteristically male view depicts sexual harassment as comparatively harmless amusement).

We realize that there is a broad range of viewpoints among women as a group, but we believe that many women share common concerns which men do not necessarily share.[9] For example, because women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with sexual behavior.[10] Women who are victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to violent sexual assault. Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive.

■ In order to shield employers from having to accommodate the idiosyncratic concerns of the rare hyper-sensitive employee, we hold that a female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman[11]

would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.[12] *Andrews*, 895 F.2d at 1482 (sexual harassment must detrimentally affect a reasonable person of the same sex as the victim); *Yates*, 819 F.2d at 637 (adopting "reasonable woman" standard set out in *Rabidue*, 805 F.2d 611, 626 (Keith, J. dissenting)); Comment, *Sexual Harassment Claims of Abusive Work Environment Under Title VII*, 97 Harv.L.Rev. 1449, 1459 (1984); *cf. State v. Wanrow*, 88 Wash.2d 221, 239–241, 559 P.2d 548, 558–559 (1977) (en banc) (adopting reasonable woman standard for self defense).

We adopt the perspective of a reasonable woman primarily because we believe that a sex-blind reasonable person standard tends to be male-biased and tends to systematically ignore the experiences of women. The reasonable woman standard does not establish a higher level of protection for women than men. *Cf. Rosenfeld v. Southern Pacific Co.*, 444 F.2d 1219, 1225–1227 (9th Cir.1971) (invalidating under Title VII paternalistic state labor laws restricting employment opportunities for women). Instead, a gender-conscious examination of sexual harassment enables women to participate in the workplace on an equal footing with men. By acknowledging and not trivializing the effects of sexual harassment on reasonable women, courts can

**9.** One writer explains: "While many women hold positive attitudes about uncoerced sex, their greater physical and social vulnerability to sexual coercion can make women wary of sexual encounters. Moreover, American women have been raised in a society where rape and sex-related violence have reached unprecedented levels, and a vast pornography industry creates continuous images of sexual coercion, objectification and violence. Finally, women as a group tend to hold more restrictive views of both the situation and type of relationship in which sexual conduct is appropriate. Because of the inequality and coercion with which it is so frequently associated in the minds of women, the appearance of sexuality in an unexpected context or a setting of ostensible equality can be an anguishing experience." Abrams, *Gender Discrimination and the Transformation of Workplace Norms*, 42 Vand.L.Rev. 1183, 1205 (1989).

**10.** United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics,

*Sourcebook of Criminal Justice Statistics 1988* at 299, table 3.19 (1989). In 1988, an estimated 73 of every 100,000 females in the country were reported rape victims. Federal Bureau of Investigation, *Uniform Crime Reports for 1988* at 16 (1989).

**11.** Of course, where male employees allege that co-workers engage in conduct which creates a hostile environment, the appropriate victim's perspective would be that of a reasonable man.

**12.** We realize that the reasonable woman standard will not address conduct which some women find offensive. Conduct considered harmless by many today may be considered discriminatory in the future. *Rogers*, 454 F.2d at 238. Fortunately, the reasonableness inquiry which we adopt today is not static. As the views of reasonable women change, so too does the Title VII standard of acceptable behavior.

work towards ensuring that neither men nor women will have to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir.1982).

We note that the reasonable victim standard we adopt today classifies conduct as unlawful sexual harassment even when harassers do not realize that their conduct creates a hostile working environment. Well-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action if a reasonable victim of the same sex as the plaintiff would consider the comments sufficiently severe or pervasive to alter a condition of employment and create an abusive working environment.[13] That is because Title VII is not a fault-based tort scheme. "Title VII is aimed at the consequences or effects of an employment practice and not at the ... motivation" of co-workers or employers. *Rogers*, 454 F.2d at 239; *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (the absence of discriminatory intent does not redeem an otherwise unlawful employment practice). To avoid liability under Title VII, employers may have to educate and sensitize their workforce to eliminate conduct which a reasonable victim would consider unlawful sexual harassment. *See* 29 C.F.R. § 1604.11(f) ("Prevention is the best tool for the elimination of sexual harassment.")

The facts of this case illustrate the importance of considering the victim's perspective. Analyzing the facts from the alleged harasser's viewpoint, Gray could be portrayed as a modern-day Cyrano de Bergerac wishing no more than to woo Ellison with his words.[14] There is no evidence that Gray harbored ill will toward Ellison. He even offered in his "love letter" to leave her alone if she wished. Examined in this light, it is not difficult to see why the district court characterized Gray's conduct as isolated and trivial.

Ellison, however, did not consider the acts to be trivial. Gray's first note shocked and frightened her. After receiving the three-page letter, she became really upset and frightened again. She immediately requested that she or Gray be transferred. Her supervisor's prompt response suggests that she too did not consider the conduct trivial. When Ellison learned that Gray arranged to return to San Mateo, she immediately asked to transfer, and she immediately filed an official complaint.

■ We cannot say as a matter of law that Ellison's reaction was idiosyncratic or hyper-sensitive. We believe that a reasonable woman could have had a similar reaction. After receiving the first bizarre note from Gray, a person she barely knew, Ellison asked a co-worker to tell Gray to leave her alone. Despite her request, Gray sent her a long, passionate, disturbing letter. He told her he had been "watching" and "experiencing" her; he made repeated references to sex; he said he would write again. Ellison had no way of knowing what Gray would do next. A reasonable woman could consider Gray's conduct, as alleged by Ellison, sufficiently severe and pervasive to alter a condition of employment and create an abusive working environment.

Sexual harassment is a major problem in the workplace.[15] Adopting the victim's

---

13. If sexual comments or sexual advances are in fact welcomed by the recipient, they, of course, do not constitute sexual harassment. Title VII's prohibition of sex discrimination in employment does not require a totally desexualized work place.

14. E. Rostand, *Cyrano de Bergerac* (B. Hooker trans. 1963).

15. Over 40 percent of female federal employees reported incidents of sexual harassment in 1987, roughly the same number as in 1980. United States Merit Systems Protection Board, *Sexual Harassment in the Federal Government: An Update* 11 (1988). Victims of sexual harassment "pay all the intangible emotional costs inflicted by anger, humiliation, frustration, withdrawal, dysfunction in family life," as well as medical expenses, litigation expenses, job search expenses, and the loss of valuable sick leave and annual leave. *Id.* at 42. Sexual harassment cost the federal government $267 million from May 1985 to May 1987 for losses in productivity, sick leave costs, and employee replacement costs. *Id.* at 39.

perspective ensures that courts will not "sustain ingrained notions of reasonable behavior fashioned by the offenders." *Lipsett*, 864 F.2d at 898, *quoting, Rabidue*, 805 F.2d at 626 (Keith, J., dissenting). Congress did not enact Title VII to codify prevailing sexist prejudices. To the contrary, "Congress designed Title VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities for women." *Andrews*, 895 F.2d at 1483. We hope that over time both men and women will learn what conduct offends reasonable members of the other sex. When employers and employees internalize the standard of workplace conduct we establish today, the current gap in perception between the sexes will be bridged.

## IV

We next must determine what remedial actions by employers shield them from liability under Title VII for sexual harassment by co-workers. The Supreme Court in *Meritor* did not address employer liability for sexual harassment by co-workers. In that case, the Court discussed employer liability for a hostile environment created by a supervisor.

The Court's discussion was brief, and it declined to issue a definitive rule. 477 U.S. at 72, 106 S.Ct. at 2408. On one hand, it held that employers are not strictly liable for sexual harassment by supervisors. *Id.* On the other hand, it stated that employers can be liable for sexual harassment without actual notice of the alleged discriminatory conduct. *Id.* It agreed with the EEOC that courts should look to agency principles to determine liability. *Id.*

We applied *Meritor* in *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir.1989). We held that "employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have

known." *Id.* at 1515–1516. Because management level employees at the hotel took no action to redress the sexual harassment of which they knew and other harassment of which they should have known, we held the employer liable. *Id.* at 1516. We have not addressed what remedial actions taken by employers can shield them from liability for sexual harassment by co-workers.

The EEOC guidelines recommend that an employer's remedy should be "immediate and appropriate." 29 C.F.R. § 1604.11(d).[16] Employers have a duty to "express[ ] strong disapproval" of sexual harassment, and to "develop[ ] appropriate sanctions." 29 C.F.R. § 1604.11(f). The EEOC explains that an employer's action is appropriate where it "fully remedie[s] the conduct without adversely affecting the terms or conditions of the charging party's employment in some manner (for example, by requiring the charging party to work ... in a less desirable location)." EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), ¶ 3103, at 3213 (1988).

The Fourth Circuit has required that a remedy be "reasonably calculated to end the harassment." *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983). It has held that an employer properly remedied sexual harassment by fully investigating the allegations, issuing written warnings to refrain from discriminatory conduct, and warning the offender that a subsequent infraction will result in suspension. *Swentek v. USAIR, Inc.*, 830 F.2d 552 (4th Cir.1987).

Similarly, in *Barrett v. Omaha National Bank*, 726 F.2d 424, 427 (8th Cir.1984), the Eighth Circuit held that an employer properly remedied a hostile working environment by fully investigating, reprimanding a harasser for grossly inappropriate conduct, placing the offender on probation for ninety days, and warning the offender that any further misconduct would result in discharge. The court concluded that Title VII

---

**16.** That regulation states: "With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."

does not require employers to fire all harassers.

■ We too believe that remedies should be "reasonably calculated to end the harassment." *Katz*, 709 F.2d at 256. An employer's remedy should persuade individual harassers to discontinue unlawful conduct. We do not think that all harassment warrants dismissal, *Barrett*, 726 F.2d at 427; rather, remedies should be "assessed proportionately to the seriousness of the offense." *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309 (5th Cir. 1987). Employers should impose sufficient penalties to assure a workplace free from sexual harassment. In essence, then, we think that the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment.[17] In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct. Indeed, meting out punishments that do not take into account the need to maintain a harassment-free working environment may subject the employer to suit by the EEOC.

■ Here, Ellison's employer argues that it complied with its statutory obligation to provide a workplace free from sexual harassment. It promptly investigated Ellison's allegation. When Ellison returned to San Mateo from her training in St. Louis, Gray was no longer working in San Mateo. When Gray returned to San Mateo, the government granted Ellison's request to transfer temporarily to San Francisco.

We decline to accept the government's argument that its decision to return Gray to San Mateo did not create a hostile environment for Ellison because the government granted Ellison's request for a temporary transfer to San Francisco. Ellison preferred to work in San Mateo over San Francisco. We strongly believe that the victim of sexual harassment should not be punished for the conduct of the harasser. We wholeheartedly agree with the EEOC that a victim of sexual harassment should not have to work in a less desirable location as a result of an employer's remedy for sexual harassment. EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), ¶ 3103, at 3213 (1988).

Ellison maintains that the government's remedy was insufficient because it did not discipline Gray and because it allowed Gray to return to San Mateo after only a six-month separation. Even though the hostile environment had been eliminated when Gray began working in San Francisco, we cannot say that the government's response was reasonable under Title VII. The record on appeal suggests that Ellison's employer did not express strong disapproval of Gray's conduct, did not reprimand Gray, did not put him on probation, and did not inform him that repeated harassment would result in suspension or termination. *Cf. Swentek*, 830 F.2d 552; *Barrett*, 726 F.2d 424. Apparently, Gray's employer only told him to stop harassing Ellison.[18] Title VII requires more than a mere request to refrain from discriminatory conduct. *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 n. 5 (1st Cir.1980). Employers send the wrong message to potential harassers when they do not discipline employees for sexual harassment. If Ellison can prove on remand that Gray knew or should have known that his conduct was unlawful and that the government failed to take even the mildest form of disciplinary action, the district court should hold that the government's initial remedy was insufficient under Title VII. At this point, genuine issues

---

17. We do not think that the appropriate inquiry is what a reasonable employer would do to remedy the sexual harassment. *Contra Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir. 1989). Although employers are statutorily obligated to provide a workplace free from sexual harassment, they may be reluctant, for business reasons, to punish high ranking and highly productive employees for sexual harassment. In addition, asking what a reasonable employer would do runs the risk of reinforcing any prevailing level of discrimination by employers and fails to focus directly on the best way to eliminate sexual harassment from the workplace.

18. Neither the counseling session with Miller nor Gray's transfer to San Francisco was a disciplinary act by the IRS.

of material fact remain concerning whether the government properly disciplined Gray.

Ellison further maintains that her employer's decision to allow Gray to transfer back to the San Mateo office after a six-month cooling-off period rendered the government's remedy insufficient. She argues that Gray's *mere presence* would create a hostile working environment.

We believe that in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment. *See Paroline v. Unisys Corp.*, 879 F.2d 100, 106–07 (4th Cir.1989). To avoid liability under Title VII for failing to remedy a hostile environment, employers may even have to remove employees from the workplace if their mere presence would render the working environment hostile.[19] Once again, we examine whether the mere presence of a harasser would create a hostile environment from the perspective of a reasonable woman.

The district court did not reach the issue of the reasonableness of the government's remedy. Given the scant record on appeal, we cannot determine whether a reasonable woman could conclude that Gray's mere presence at San Mateo six months after the alleged harassment would create an abusive environment. Although we are aware of the severity of Gray's conduct (which we do not consider to be as serious as some other forms of harassment), we do not know how often Ellison and Gray would have to interact at San Mateo.

Moreover, it is not clear to us that the six-month cooling-off period was reasonably calculated to end the harassment or assessed proportionately to the seriousness of Gray's conduct. There is evidence in the record which suggests that the government intended to transfer Gray to San Francisco permanently and only allowed Gray to return to San Mateo because he promised to drop some union grievances. We do know that the IRS did not request Ellison's input or even inform her of the proceedings before agreeing to let Gray return to San Mateo. This failure to even attempt to determine what impact Gray's return would have on Ellison shows an insufficient regard for the victim's interest in avoiding a hostile working environment. On remand, the district court should fully explore the facts concerning the government's decision to return Gray to San Mateo.[20]

## V

We reverse the district court's decision that Ellison did not allege a prima facie case of sexual harassment due to a hostile working environment, and we remand for further proceedings consistent with this opinion. Although we have considered the evidence in the light most favorable to Ellison because the district court granted the government's motion for summary judg-

---

**19.** If harassers are not removed from the workplace when their mere presence creates a hostile environment, employers have not fully remedied the harassment. When employers cannot schedule harassers to work at another location or during different hours, employers may have to dismiss employees whose mere presence creates a hostile environment. We acknowledge that in rare instances dismissal may be necessary when harassers did not realize that their conduct was unlawful. However, we think that only in very, very few cases will harassers be unaware that their conduct is unlawful when that conduct is so serious that a reasonable victim would thereafter consider the harasser's mere presence sexual harassment. In those few instances, we think it only proper to conclude that the harasser should have known that his or her conduct was unlawful.

In order to avoid the loss of well-intentioned productive employees, employers must educate and sensitize their workforce.

**20.** We note that if the district court decides that the government's actions were not reasonably calculated to end the harassment or assessed proportionately to the seriousness of the conduct, Ellison's relief will be primarily injunctive. Title VII does not provide for compensatory or punitive damages. *See Williams v. United States General Services Administration*, 905 F.2d 308, 311 (9th Cir.1990).

In the event that the district court decides to award Ellison equitable relief, the court should not fail to consider any relevant commitments made by the government in Gray's settlement agreement.

ment, we, of course, reserve for the district court the resolution of all factual issues.

REVERSED and REMANDED.

STEPHENS, District Judge, dissenting:

This case comes to us on appeal in the wake of the granting of a summary judgment motion. There was no trial, therefore no opportunities for cross examination of the witnesses. In addition, there are factual gaps in the record that can only lead by speculation. Consequently, I believe that it is an inappropriate case with which to establish a new legal precedent which will be binding in all subsequent cases of like nature in the Ninth Circuit. I refer to the majority's use of the term "reasonable woman," a term I find ambiguous and therefore inadequate.

Nowhere in section 2000e of Title VII, the section under which the plaintiff in this case brought suit, is there any indication that Congress intended to provide for any other than equal treatment in the area of civil rights. The legislation is designed to achieve a balanced and generally gender neutral and harmonious workplace which would improve production and the quality of the employees' lives. In fact, the Supreme Court has shown a preference against systems that are not gender or race neutral, such as hiring quotas. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). While women may be the most frequent targets of this type of conduct that is at issue in this case, they are not the only targets. I believe that it is incumbent upon the court in this case to use terminology that will meet the needs of all who seek recourse under this section of Title VII. Possible alternatives that are more in line with a gender neutral approach include "victim," "target," or "person."

The term "reasonable man" as it is used in the law of torts, traditionally refers to the average adult person, regardless of gender, and the conduct that can reasonably be expected of him or her. For the purposes of the legal issues that are being addressed, such a term assumes that it is applicable to all persons. Section 2000e of Title VII presupposes the use of a legal term that can apply to all persons and the impossibility of a more individually tailored standard. It is clear that the authors of the majority opinion intend a difference between the "reasonable woman" and the "reasonable man" in Title VII cases on the assumption that men do not have the same sensibilities as women. This is not necessarily true. A man's response to circumstances faced by women and their effect upon women can be and in given circumstances may be expected to be understood by men.

It takes no stretch of the imagination to envision two complaints emanating from the same workplace regarding the same conditions, one brought by a woman and the other by a man. Application of the "new standard" presents a puzzlement which is born of the assumption that men's eyes do not see what a woman sees through her eyes. I find it surprising that the majority finds no need for evidence on any of these subjects. I am not sure whether the majority also concludes that the woman and the man in question are also reasonable without evidence on this subject. I am irresistibly drawn to the view that the conditions of the workplace itself should be examined as affected, among other things, by the conduct of the people working there as to whether the workplace as existing is conducive to fulfilling the goals of Title VII. In any event, these are unresolved factual issues which preclude summary judgment.

The focus on the victim of the sexually discriminatory conduct has its parallel in rape trials in the focus put by the defense on the victim's conduct rather than on the unlawful conduct of the person accused. Modern feminists have pointed out that concentration by the defense upon evidence concerning the background, appearance and conduct of women claiming to have been raped must be carefully controlled by the court to avoid effectively shifting the burden of proof to the victim. It is the

accused, not the victim who is on trial, and it is therefore the conduct of the accused, not that of the victim, that should be subjected to scrutiny.[1] Many state legislatures have responded to this viewpoint, and rules governing the presentation of evidence in rape cases have evolved accordingly.[2] *See generally*, Galvin, Shielding Rape Victims in the State and Federal Courts: a Proposal for the Second Decade, 70 Minn.L. Rev. 763 (April 1986).

It is my opinion that the case should be reversed with instructions to proceed to trial. This would certainly lead to filling in the factual gaps left by the scanty record, such as what happened at the time of or after the visit of Ellison to Gray's house to cause her to be subsequently fearful of his presence. The circumstances existing in the work place where only men are employed are different than they are where there are both male and female employees. The existence of the differences is readily recognizable and the conduct of employees can be changed appropriately. This is what Title VII requires. Whether a man or a woman has sensibilities peculiar to the person and what they are is not necessarily known. Until they become known by manifesting themselves in an obvious way, they do not become part of the circumstances of the work place. Consequently, the governing element in the equation is the workplace itself, not concepts or viewpoints of individual employees. This does not conflict with existing legal concepts.

The creation of the proposed "new standard" which applies only to women will not necessarily come to the aid of all potential victims of the type of misconduct that is at issue in this case. I believe that a gender neutral standard would greatly contribute to the clarity of this and future cases in the same area.

Summary judgment is not appropriate in this case.

---

**1.** *Cf. People v. Rioz,* 161 Cal.App.3d 905, 909–910, 207 Cal.Rptr. 903, 916 (1984) (evidence of whether the victim engaged in sexual activity with numerous men, even for pecuniary gain, is controlled by the procedural safeguards in evidentiary law).

**2.** *See* Fed.R.Civ.Pro. 412; Vhay, The Harms of Asking: Towards a Comprehensive Treatment of Sexual Harassment, 55 U.Chi.L.Rev. 328, 345, n. 78 (Winter 1988); Fechner, Toward an Expanded Conception of Law Reform: Sexual Harassment Law and the Reconstruction of Facts, 23 U.Mich.J.L.Ref. 475, 495 (Spring 1990).