**Yolanda STINGLEY, Plaintiff,**

**v.**

**STATE of ARIZONA, etc.,
et al., Defendants.**

**No. Civ 91–122 TUC JMR.**

United States District Court,
D. Arizona.

July 27, 1992.

Lola Rainey, Tucson, Ariz., Lonnie J. Williams, Jr., Snell & Wilmer, Phoenix, Ariz., for plaintiff.

John F. Munger, Steven G. Sandoval, Alexis J. Stanton, Munger & Munger, Tucson, Ariz., Linda A. Thompson, Asst. Atty. Gen., Phoenix, Ariz., for defendants.

## OPINION AND ORDER

ROLL, District Judge.

Following a hearing, the Court took certain portions of Defendants' Motions for Summary Judgment[1] under advisement. *See* Minute Entry (filed June 24, 1992). The Court has reviewed the briefs and exhibits filed by the parties, as well as carefully considered their oral arguments.

### FACTUAL OVERVIEW:

The facts, viewed in the light most favorable to the Plaintiff, *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), and drawn almost entirely from the documents submitted by the Plaintiff, are as follows.

Plaintiff Yolanda Stingley, an African–American woman, began working for the Arizona Department of Corrections (DOC) as a Correctional Service Officer (CSO) in July 1989.[2] Plaintiff was assigned to swing shift in DOC–Wilmot's Cimarron Unit. The Defendants were also all assigned to the Cimarron Unit: Wallin was a fellow CSO, Austin was a sergeant, and Matthews was a lieutenant.

Working on swing shift in Cimarron at that time was an African–American man, CSO Harrison. It appears that CSO Harrison was frequently the object of racist nicknames and racial slurs.[3] Among the people using the names and slurs was Wallin. Plaintiff was present when these names and slurs were used. Apparently, line supervisors of the DOC, including Austin, were also present, but did not act to stop the behavior and apparently also used the names and slurs. Plaintiff was also the object of a racial slur when one of her white coworkers called her a "black bitch slut."

It appears that Plaintiff was more directly the object of sexual, as opposed to racial,

---

**1.** These three defendants, having joined in this Motion, shall be referred to collectively as the "Movants."

**2.** According to the excerpts of employment applications supplied by the Movants, between September 1982 and May 1988, before starting with DOC, Stingley held three clerical/secretarial positions. Each new job apparently involved more responsibility than the previous job, and each job change increased Stingley's salary.

All these job changes, including the move to the DOC, are viewed by Plaintiff as career advancement.

**3.** Apparently the racist nicknames included watermelon eater, naphead, nigger, spearchucker, etc. Harrison's usual nickname was "token."

harassment. When she first began working swing shift in Cimarron, one of her male coworkers "assigned" Plaintiff the nickname of "I.B.T.", abbreviation for "itty bitty titties." On September 20, 1989, Wallin allegedly poked at Plaintiff's buttock twice with a plastic fork, explaining that he was checking to see if "the meat was done." On another occasion, a male coworker walked up behind Plaintiff and snapped her bra.

In October 1989 CSO Harrison filed a complaint with the DOC. In support of that complaint, Plaintiff, for the first time, reported the incidents of racial and sexual harassment. As a result of the investigation of Harrison's and Plaintiff's complaints, Wallin was terminated, Austin was demoted, and Matthews was reprimanded.

Sometime around November 1989, Plaintiff transferred from swing shift to midnight shift, apparently due in part to the racist namecalling and sexual harassment. Plaintiff later requested a transfer to the Juvenile DOC as a secretary, and that transfer was approved in March 1990. Plaintiff filed a discrimination claim with the EEOC and, after she was given her right to sue letter, filed this suit on March 14, 1991.

This Motion for summary judgment is brought by only three of the individual Defendants, Lt. Matthews, CSO Austin, and Wallin. Summary judgment is, of course, only appropriate when there are no factual disputes. Fed.R.Civ.P. 56. All evidence is to be interpreted in the light most favorable to the non-movant, Stingley. *See, e.g., Diebold,* 369 U.S. at 655, 82 S.Ct. at 994.

### Count I: Violation of Title VII

Under Title VII of the 1964 Civil Rights Act, "employers" may not discriminate on the basis of, *inter alia,* the race, sex, or color of their employees with respect to

any condition or privilege of employment. 42 U.S.C. § 2000e–2(a)(1). With respect to the three Defendants–Movants, it appears that Plaintiff is alleging discrimination based on a "hostile environment" theory, and also on a theory of "constructive discharge." *See* Plaintiff's Response to Motion (May 8, 1992). Initially, this Court must resolve the dispute over which of the Defendants are "employers" subject to Title VII.

### Title VII Employers

The Defendants contend that neither Austin nor Matthews are "employers" under Title VII.[4] The definition of an "employer" in Title VII includes agents of an employer. 42 U.S.C. § 2000e.

*Austin.* Austin was apparently a DOC sergeant supervising swing shift during part of the time that Plaintiff was assigned to it. An immediate supervisor is a Title VII employer "when delegated the employer's traditional rights, such as hiring and firing." *Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir.1990).[5] In this case, according to the DOC, supervisors in Austin's position are "responsible for developing and maintaining good working relationships among their subordinates." Notice of Demotion to R. Austin (Feb. 15, 1990), Response, Exhibit (Ex.) 3. The DOC's line supervisors "are expected to create a favorable working atmosphere and ... to maintain firm *impartial* control." *Id.* (original emphasis). The DOC's description of Austin's responsibilities as including "control" over subordinates strongly suggests that he had been delegated many, if not all, of an employer's "traditional rights." The Court therefore concludes, that Austin was a Title VII employer.

*Matthews.* Obviously, if a DOC sergeant is a Title VII employer, so is a DOC lieutenant.

---

**4.** CSO Wallin, Plaintiff's co-worker, is clearly an employee, not a Title VII employer. Wallin cannot violate Title VII. Plaintiff has conceded this and withdrawn Count 1 as to Wallin.

**5.** *Harvey* also explains that individuals may only be sued for Title VII violations in their *official*

capacities. Plaintiff has apparently named the individual Defendants in this case in both their official and unofficial capacities. As to the Title VII count, the individual Defendants may only be held liable in their official capacities.

*Hostile Environment Theory of Discrimination*

Austin and Matthews are accused of having created or permitted a work environment hostile to African–Americans and to women. "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

■■■ Title VII hostile environment claims are founded on the same principles whether based on race or sex. *See Meritor,* 477 U.S. at 66, 106 S.Ct. at 2405. *See also* 29 C.F.R. § 1604.11, n. 1 (1991) (principles defining sexual harassment also apply to discrimination because of race, color, etc.). These principles were first announced in *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). In his opinion supporting the Fifth Circuit's reversal of the district court,[6] Circuit Judge Goldberg states:

> [I]t is my belief that employees' psychological as well as economic fringes are statutorily entitled to protection from employer abuse, and that the phrase "terms, conditions, or privileges of employment" in Section 703 [of Title VII (42 U.S.C. § 2000e–2)] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination. I do not wish to be interpreted as holding that an employer's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee falls within the proscription of Section 703. But by the same token I am simply not willing to hold that a discriminatory atmosphere could under no set of circumstances ever constitute an unlawful employment practice. One can readily envision working environments so heavily polluted with

discrimination as to destroy completely the emotional and psychological stability of minority group workers, and I think Section 703 of Title VII was aimed at the eradication of such noxious practices.

454 F.2d at 238; *quoted in part in Meritor,* 477 U.S. at 66, 106 S.Ct. at 2405. The abusive conduct which creates the hostile environment need not be directed toward the plaintiff specifically. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir. 1987), *appeal after remand* 928 F.2d 966 (10th Cir.1991). Further, evidence of racial hostility may be aggregated with evidence of sexual hostility in determining the extent to which the environment is hostile to the plaintiff. *Id.*

■ The Title VII employer need not have an active role in creating the hostile environment. It is enough that the "employer (or its agents or supervisory employees) knows or should have known" of the improper conduct by the plaintiff's co-workers which creates the hostile environment. 29 C.F.R. § 1604.11(d).[7] To escape liability for conduct which creates a hostile environment, the Title VII employer must "show that it took immediate and appropriate corrective action." *Id.*

■ The proper perspective from which to evaluate the hostility of the environment is the "reasonable person of the same gender and race or color" standard. In the sexual harassment case of *Ellison v. Brady,* 924 F.2d 872, 878–79 (9th Cir.1991), the court held that the proper reference for evaluating the "severity and pervasiveness" of the harassment is from the perspective of a reasonable victim of the same gender. This "reasonable woman" standard is designed to accommodate the different ways men and women may view similar behavior. *Ellison's* reasoning may be applied seamlessly to racist environment claims,[8] and at least one district court has

---

**6.** Each judge wrote separately.

**7.** Courts may consider the EEOC guidelines when interpreting Title VII. *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404.

**8.** To illustrate, in *Ellison* the Ninth Circuit noted that as few as two incidents in which a noose was found hung over a black female employee's work station were sufficient to establish a jury question regarding a racially hostile work environment. 924 F.2d at 878. A noose means

done so. *Harris v. Int'l Paper Co.*, 765 F.Supp. 1509, 1516 n. 12 (D.Me.1991) ("The appropriate standard to be applied in hostile environment harassment cases is that of a reasonable person from the protected group of which the alleged victim is a member."), *vacated in part* 765 F.Supp. 1529 (D.Me.1991). Based on *Ellison*, a "reasonable person of the same gender and race or color" standard will be applied in deciding this Motion.

■ *Damages.* The Defendants point to Plaintiff's alleged inability to prove damages as a result of the hostile environment. Hostile environment claims do not require economic injuries. *See, e.g., Meritor*, 477 U.S. 57 at 65, 106 S.Ct. 2399 at 2404. Further, Plaintiff apparently was forced to change shifts in order to escape the alleged harassment and the racist environment. DOC Investigation Memorandum 3 (Nov. 8, 1989), Response, Ex. 2. It may be reasonably inferred that because Plaintiff had to change to the midnight shift she suffered some damages. Additionally, Plaintiff seeks declarative and injunctive relief. Complaint 1.

■ *Austin.* As a supervisor, Austin had a Title VII responsibility to maintain an environment free of racism and sexual harassment. Evidence supports the Plaintiff's claim that Austin failed to meet his responsibility. Plaintiff states that Austin was present in the yard office on innumerable occasions when racist nicknames were used to refer to CSO Harrison and that Austin took no action. Deposition of Y. Stingley 80–82 (Feb. 20, 1992), Response, Ex. 1. Austin also used racist nicknames, although not when referring to Plaintiff. *Compare* Notice of Demotion to R. Austin (Feb. 15, 1990), Response, Ex. 3, *with* Deposition of Y. Stingley 80, Response, Ex. 1. Further, it appears from the DOC's investigation that Plaintiff's usual nickname while under Austin's supervision was "I.B.T.", "itty bitty titties." DOC Investi-

gation Memorandum 2, 11 (Nov. 8, 1989), Response, Ex. 2.

In his affidavit, Austin denies wrongdoing. On the record presented, the Court must deny summary judgment for Austin because a dispute over material facts exists.

■ *Matthews.* The DOC found that Matthews was aware of incidents of racial and sexual harassment but failed to take appropriate action to halt such harassment. Letter of Reprimand to R. Matthews (Feb. 15, 1990), Response, Ex. 4. Based on the record before the Court in this summary judgment motion, it is difficult to determine much about Matthews's involvement. *See* Deposition of M. Kilgore 29–30 (Mar. 31, 1992), Response, Ex. 7. Matthews, in her affidavit denies that she knew or should have known about the allegedly hostile environment in which Plaintiff worked.

■ However, Matthews has not plainly shown that she took "immediate and appropriate corrective action" in this case. Whatever action a Title VII employer takes, to be a defense the employer's action must be "reasonably calculated" to be successful in stopping the harassment. 924 F.2d at 881–82. Matthews apparently gave a short speech to the swing shift in July or August 1989. *See* Kilgore Depo. There is no evidence that this speech succeeded in improving the work environment. For example, CSO Harrison filed his complaint with the DOC in late October, several months after the speech. Thus, genuine issues of material fact remain regarding this Title VII hostile environment claim.

*Constructive Discharge Theory*

■ When a reasonable employee faced with intolerable and discriminatory working conditions feels that he or she must quit, then a constructive discharge has occurred. *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.1987). In this case, Plaintiff did not quit, but requested a transfer to a secretarial position

much more in the history of African–Americans than it does in the history of European–Americans. The Ninth Circuit thus implies that it accepts the "reasonable person of the same race or color" standard for Title VII cases by its recognition in *Ellison* of the relative severity of only two incidents involving an African–American employee and a noose.

in the Juvenile DOC. Her new position allegedly has less career development potential than did Plaintiff's position as a CSO. *See* Response to Moving Parties' Statement of Facts 3 (May 8, 1992). Plaintiff contends that she was forced to transfer and that the transfer is the equivalent of a constructive discharge. The Court need not decide this issue, however.

Based on the evidence now before the Court in support of and in opposition to the Motion for Summary Judgment, it appears that Austin's and Matthews's involvement in the allegedly hostile environment ended when Plaintiff transferred to midnight shift, which was apparently sometime before the late October 1989 DOC investigation, and apparently several months before Plaintiff requested her transfer to the Juvenile DOC (transfer approved Mar. 16, 1990). Although Defendants other than the Movants may have constructively discharged Plaintiff, Plaintiff has failed to submit sufficient evidence that Austin or Matthews had any involvement with Plaintiff at the time she decided to transfer.

*Conclusions as to the Title VII Allegation*

 Wallin does not qualify as a Title VII employer and, accordingly, cannot be held liable on this claim. Austin and Matthews were Title VII employers and there is evidence that they failed to address the allegedly hostile environment confronting Plaintiff on swing shift. The Court must deny their Motion for summary judgment as to the hostile environment theory of Count I.

Plaintiff appears to have left swing shift four or five months before she decided to transfer to a secretarial position with the JDOC. The Court sees no evidence before it of any involvement of Austin or Matthews in Plaintiff's work environment after she transferred to midnight shift. Thus, as to Austin and Matthews, the Court grants their Motion insofar as the constructive discharge theory of Count I.

*Count III: Interfering with Contract*

 Both the Plaintiff and the Defendants argue that *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 710 P.2d 1025 (1985), supports their respective positions on the issue of whether the Defendants intentionally interfered with Plaintiff's contract of employment with the DOC. *Wagenseller* involved the deliberate firing of an employee for "bad cause." Neither party cites any case applying an intentional interference with a contract claim to a state agency employment situation and neither party cites a case which holds that evidence of a hostile working environment supports an allegation of intentional interference with an employment contract.

 Unlike Title VII, a claim for intentional interference with a contract requires some evidence of a breach or termination of a contractual relationship or expectancy, and some resultant damages. 147 Ariz. at 386, 710 P.2d at 1041. On the record presented, the Court cannot find any evidence of a breach or termination of a contractual expectancy, nor can it discern any evidence of damage caused by the Defendants. Even if the Court assumes, as Plaintiff asks the Court to do in her Response at 10, that these three Defendants intended to interfere with her employment relationship with the DOC, Plaintiff fails to point to any evidence that the Defendants succeeded in interfering. Therefore, the Defendants' Motion is granted and this claim is dismissed.

*Count IV: Infliction of Emotional Distress*

 Both parties argue that *Ford v. Revlon, Inc.*, 153 Ariz. 38, 734 P.2d 580 (1987), supports their respective positions regarding the issue of whether the Plaintiff has proffered sufficient evidence of the Defendants' intentional infliction of emotional distress to survive this Motion for Summary Judgment. *Ford* involved a supervisor's repeated sexual harassment of a subordinate, including an attempted sexual assault, and the corporate hierarchy's failure over many months to address Ford's repeated pleas for assistance. The supreme court applied the traditional elements of the tort of intentional infliction of emotional distress: extreme and out-

rageous conduct, the actor's intent to cause distress or a reckless disregard of the high probability of distress, and resultant severe emotional distress. 153 Ariz. at 43, 734 P.2d at 585. The evidence in *Ford* was sufficient to uphold a jury's verdict that the supervisor's corporate employer, Revlon, had committed the tort of intentional infliction of emotional distress.

Neither party has presented the Court with cases defining the interplay between claims of sexual harassment cognizable under Title VII's protection, and those which rise to the level of the tort of intentional infliction of emotional distress. As the Court reads the cases arising from Title VII, statutory discrimination occurs at a much lower threshold of inappropriate conduct than the threshold required for the tort of intentional infliction of emotional distress. Thus, the fact that there is a Title VII hostile environment does not necessarily support a claim of intentional infliction of emotional distress.

■ *Wallin.* In this case, the only behavior toward the Plaintiff reaching the requisite level of outrageousness is Wallin's action of poking Plaintiff twice in the buttock with a plastic fork and explaining his action as checking to see if "the meat" was done. This claim is sufficiently egregious to preclude summary judgment on it.

■ *Matthews and Austin.* Until the DOC's investigation of CSO Harrison's complaint, Plaintiff never told anyone about the fork incident. Matthews and Austin cannot be held to have acted outrageously for failing to respond to something they knew nothing about. Matthews and Austin themselves are not accused of doing anything particularly outrageous toward Plaintiff.[9] Accordingly their motion for summary judgment on this count is granted.

### Count IX: Public Policy Violation

Plaintiff alleges that her transfer to the JDOC was the equivalent of a termination under state law and that Austin and Mat-

thews caused her this constructive discharge in violation of public policy. In *Wagenseller,* the Arizona Supreme Court announced a "public policy" exception to the doctrine that at-will employees may be terminated without cause. Plaintiff argues that *Wagenseller* is not restricted to at-will employees. However, the Court need not decide this issue. Plaintiff's transfer to the JDOC is remote from the last evidence of either Austin's or Matthews's influence over Plaintiff's employment status. Therefore, for the reasons discussed above regarding Plaintiff's constructive discharge claim, Austin's and Matthews's motions for summary judgment on this claim are granted.

### Oral Motion for Attorneys Fees

■ At the hearing, the Defendants requested that they be awarded attorneys' fees for the time expended responding to allegations later withdrawn by Plaintiff. Plaintiff requested that the application for attorneys' fees be made in writing. The Defendants included a request for attorneys' fees in their Reply (June 4, 1992). However, the Defendants have not filed a memorandum of points and authorities supporting their application for fees. Ariz. Dist.Ct.R. 11(b). The Court prefers that a motion such as this be made in writing with a memorandum in support. Therefore, Defendants' requests for attorneys' fees are denied with leave to renew in writing.

### IT IS ORDERED:

*Wallin.* Summary judgment is GRANTED Defendant Wallin on Counts 3 and 9 and these counts are DISMISSED. Summary judgment is DENIED Defendant Wallin on Count 4. Pursuant to the Court's June 22 Minute Entry, Count 1 has been withdrawn by the Plaintiff, and Counts 2 and 5–8 are DISMISSED.

The only claim now pending against Wallin is the intentional infliction of emotional distress claim of Count 4.

*Austin and Matthews.* Summary judgment is GRANTED Defendants Austin and

---

**9.** Although Matthews and Austin may have behaved below the standards set by Title VII, that

fact does not establish a prima facie case of intentional infliction of emotional distress.

Matthews on Counts 3, 4, and 9, on the constructive discharge allegation of Count 1, and on the Title VII liability of Austin and Matthews in their unofficial capacities and these allegations are DISMISSED. Summary judgment is DENIED Defendants Austin and Matthews, in their official capacities, on the hostile work environment allegation of Count 1. Pursuant to the court's June 22 Minute Entry, Counts 2 and 5–8 are DISMISSED.

The only claim now pending against Austin and Matthews is the hostile environment claim of Count 1.

*Injunctive relief.* The Defendants invite the Court to dismiss Plaintiff's request for injunctive relief. Neither party argues this issue. In light of the continuing viability of the Title VII claims against Austin and Matthews, the Court DENIES the motion for summary judgment on the issue of injunctive relief.

*Attorneys fees.* The Defendants' motions for attorneys' fees are DENIED with leave to renew.