**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 18 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

DARLA ADLER,

      Plaintiff - Appellant,

vs.

WAL-MART STORES, INC.,

      Defendant - Appellee.

No. 97-1026

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## (D.C. No. 95-M-2934)

Richard P. Brentlinger (Robert J. Thomas and Mary E. Toornman with him on the brief), Inman, Flynn & Biesterfeld, P.C., Denver, Colorado, for Plaintiff-Appellant.

James J. Murphy (Kirk R. McCormick with him on the brief), McCormick & Murphy, P.C., Colorado Springs, Colorado, for Defendant-Appellee.

Before **KELLY**, **BARRETT**, and **BRISCOE**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiff-Appellant Darla Adler appeals from summary judgment granted in favor of Defendant-Appellee Wal-Mart Stores, Inc. on her Title VII claim for hostile work environment sexual harassment and her state claim for intentional

infliction of emotional distress. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## Background

Plaintiff began her employment at the Wal-Mart Distribution Center in Loveland, Colorado, on July 12, 1993. On October 30, 1993, she was assigned to a position in the battery room of the maintenance department. Much of the work in the Center was performed with forklifts, and Plaintiff's duties in this position were to clean and change forklift batteries. In the fall of 1994, she was promoted to forklift mechanic.

Shortly after Plaintiff was assigned to the maintenance department, male and female employees who were not in maintenance, but on the floor, began harassing her. For instance, various forklift drivers suggested that Plaintiff got the position because she is a woman, and must have performed sexual favors for the maintenance manager, Jesse Kirchmeier, to get the position.

In January 1994, Plaintiff reported this to Mr. Kirchmeier and Earl Larson but would not disclose the names of any harassers. Mr. Larson was her immediate supervisor, an hourly employee without any authority to hire, fire, or formally discipline employees. In response to her complaint, Mr. Kirchmeier notified all other area managers that if their forklift drivers could not act appropriately in the maintenance department, the drivers would have to get their managers to take the

forklifts in for maintenance.  Harassment from floor employees then stopped, and many employees apologized to Plaintiff.  After these events, Mr. Kirchmeier asked Plaintiff weekly whether she was having any problems and, until after the events of August 14 discussed below, Plaintiff told him everything was fine.

In December 1993 or January 1994, a coworker of Plaintiff's, Alan Zalaznik, proposed to do some electrical work in her home in exchange for oral sex.  A day or so later, Mr. Zalaznik told Plaintiff that he thought he saw her in Mr. Kirchmeier's office with her head bobbing up and down, and insinuated that she had gotten her job by giving sexual favors to Mr. Kirchmeier.  Plaintiff reported these incidents to Mr. Larson, who had Mr. Zalaznik apologize to Plaintiff.

In March 1994, in the parking lot and off the clock, Mr. Zalaznik hesitated to walk in the rain.  Plaintiff laughed and told him he wouldn't melt, and if he did she would scoop him up.  Mr. Zalaznik responded by grabbing his crotch and making a lewd statement.    See Aplt. App. at 82.  Plaintiff reported the parking lot incident to Mr. Larson, who informed Mr. Kirchmeier.  Mr. Larson gave Mr. Zalaznik a verbal warning, and lodged a document in his file to that effect.  Mr. Larson also explained to Mr. Zalaznik Wal-Mart's sexual harassment policy and the seriousness of sexual harassment--that he could be fired for such comments-- and required Mr. Zalaznik to apologize again to Plaintiff.  Mr. Larson considered

more severe discipline inappropriate based on this incident because both employees were off the clock and in the parking lot. Harassment from Mr. Zalaznik then stopped.

Other coworkers harassed Plaintiff in various additional incidents, but Plaintiff either did not report them, or cannot recall specifically when or what she may have said to anyone about them. On August 14, 1994, incidents occurred which Plaintiff did report, involving maintenance coworkers Matt Berwick and Ray McFarland. At one pont, Mr. Berwick and Mr. McFarland shook a bottle of baby powder at her and said they wanted to powder her bottom. The same day, Plaintiff played a practical joke on Mr. Berwick and Mr. McFarland. She poured water on the foam seats of their cart so that when they sat down their pants were soaked, and they had wet pants the rest of the day. Later that day, Mr. Berwick climbed on the forklift that Plaintiff was operating and wrapped his leg around her. In addition, Mr. McFarland called Plaintiff from a phone at Wal-Mart and told her that he thought she would be fun in bed and that he wanted to meet her in the parts room to have sex. After this call, Plaintiff was frightened and hid under a desk to avoid him.

Plaintiff reported these events to Mr. Larson, who relayed them to Mr. Kirchmeier, who in turn relayed them to the Personnel Director, Bill Clauser. Within a day, Mr. Clauser and Mr. Kirchmeier interviewed Plaintiff, and Mr.

Clauser then interviewed about ten individuals, compiling some twenty-seven pages of notes. In his investigation, Mr. Clauser learned of previous unreported incidents of harassment by Mr. Berwick and Mr. McFarland. Mr. Clauser also gained information about Plaintiff's own participation in the joking, including sexually suggestive gestures and comments. In particular, he learned of her apparently joking discussions with coworkers of how she could set up Mr. Kirchmeier on false sexual harassment charges if paid to do so.

As a result of the investigation, Mr. McFarland was given what is called a "Step One" in Wal-Mart's disciplinary scheme. There are four potential verbal warnings short of a Step One. A Step One is a written coaching record. Mr. Berwick was given a Step Three, which is a paid one-day suspension--a "decision day" during which the employee considers whether he or she wants the job, and submits a written corrective plan to return to work. This is the only discipline in Wal-Mart's scheme short of a Step Four, which is termination. Mr. Berwick's discipline was more severe because he initially denied the events. Ms. Adler was given a Step One for her actions. Harassment from Mr. Berwick and Mr. McFarland then stopped.

On November 9, 1994, an employee referred to in the record as Larry (because Plaintiff cannot recall his full name) ran his hand down Plaintiff's back to the tailbone. She cannot recall specifically when; but on November 18, she

reported this incident. On November 12, 1994, Steve Runyon ran his fingers through Plaintiff's hair, touching her head and neck, in an attempt to talk her out of taking his forklift. On November 18, Plaintiff reported these events to Mr. Larson and Mr. Kirchmeier. Mr. Clauser interviewed both Mr. Runyon and a Larry Medina, thought to be the Larry harasser. Mr. Runyon admitted his conduct and Mr. Clauser counseled him on Wal-Mart's sexual harassment policy and documented this action in Mr. Runyon's personnel file. Mr. Medina denied any incident, and Mr. Clauser was unable to find anyone who could corroborate Plaintiff's account. Mr. Clauser nevertheless took the opportunity to explain Wal-Mart's sexual harassment policy to Mr. Medina. Plaintiff left work the next day, taking a leave of absence from November 19, 1994 until January 4, 1995, when she resigned.

On appeal, Plaintiff contends the district court erred in granting summary judgment on her Title VII hostile work environment claim by concluding that: (1) Wal-Mart lacked knowledge of unreported incidents of harassment; (2) no perpetrators repeated their harassing conduct; and (3) Wal-Mart's remedial action was adequate, although she later suffered harassment by others. Plaintiff also contends that the district court erred in granting summary judgment on her intentional infliction of emotional distress claim by concluding that the claim is preempted by the Colorado Worker's Compensation statute.

Discussion

I. Summary Judgment

We review the grant of summary judgment de novo applying the same standard as the district court embodied in Rule 56(c). *See* Buchanan v. Sherrill, 51 F.3d 227, 229 (10th Cir. 1995). Summary judgment is proper if the movant demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, we view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 781 (10th Cir. 1995). An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *See* id. If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If there is no genuine issue of material fact, we next determine whether the district court correctly applied the substantive

- 7 -

law.  See Hirase-Doi , 61 F.3d at 781.

The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Celotex , 477 U.S. at 323.  In so doing, a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim.  See id. at 325.  Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.  See id.

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.  Fed. R. Civ. P. 56(e);  see  Lujan v. National Wildlife Fed'n , 497 U.S. 871, 888-89 (1990);  Celotex , 477 U.S. at 324; Anderson , 477 U.S. at 248.  To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.  See Thomas v. Wichita Coca-Cola Bottling Co. , 968 F.2d 1022, 1024 (10th Cir.),  cert. denied , 506 U.S. 1013 (1992).  Thus, although our review is de novo, we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately

brought to the attention of the district court by the parties.

On appeal, Plaintiff gives insufficient attention to the procedural posture of this appeal and to the important policies furthered by the rules governing the relationship between the district and circuit courts. Wal-Mart carried its initial burden of production on summary judgment, taking each incident of harassment alleged in the complaint and demonstrating with numerous references to attached exhibits that Wal-Mart either lacked actual or constructive notice of the incident or that it adequately responded thereto. Rather than argue on appeal that her response to this motion was adequate to carry her burden to set forth specific facts demonstrating a genuine issue of material fact, Plaintiff argues that the district court erred based on specific facts and arguments not brought to its attention. After reviewing Plaintiff's response--from the perspective of the district court, and in accordance with Rule 56 and the cases construing it--the propriety of summary judgment against her is readily apparent.

Although length of the motion materials is certainly not dispositive, it is telling in this case. Plaintiff submitted, in response to the summary judgment motion, approximately three and one half pages of argument on the essential element as to which Wal-Mart demonstrated an absence of evidence--the inadequacy of Wal-Mart's response to incidents of which it had notice. This was the only ground argued by Wal-Mart for summary judgment on the hostile work

environment sexual harassment claim. Plaintiff's discussion made only seven references to attached materials, including reference to only eight pages of Plaintiff's two hundred-and-ninety-page deposition, and none to any of the multitude of materials already in the record. None of these, as explained in detail below, demonstrated that a trial was required. [1] The conclusory allegations in Plaintiff's complaint, although verified, are of as little help in carrying her burden under Rule 56(e) as are the conclusory arguments in her brief. [2] See Fed. R. Civ. P. 56(c), (e); Celotex , 477 U.S. at 324; Thomas , 968 F.2d at 1024; Conaway v.

_____

[1] The dissent criticizes us for expecting Plaintiff to carry her shifted burden on summary judgment in her own motion materials. See Dissent at 1-2. The dissent's criticism ignores the burden-shifting analysis we are to apply when judging summary judgment motions. Rule 56(e) and Celotex direct us to focus on the nonmovant's submission once the movant has met its prima facie burden of production. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 322-23. The natural consequence of this shifted burden of production to the nonmovant is, of course, that the nonmovant must produce.

"The dissent's apparent misunderstanding of these burdens 'has an obvious and critical impact on its assessment of this record.'" Mares v. Conagra Poultry Co., 971 F.2d 492, 494 n.2 (10th Cir. 1992). Aside from the dissent's purely legal argument for a stricter test of employers' responses to harassment, which we address below, the dissent's factual arguments fail because they depend upon this improper assessment of the record. See Aramburu v. Boeing Co., 112 F.3d 1398, 1402 (10th Cir. 1997) ("We view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury."); Langley v. Adams County, 987 F.2d 1473, 1476 (10th Cir. 1993); Williams v. Rice, 983 F.2d 177, 179 (10th Cir. 1993); Mares, 971 F.2d at 494; Thomas, 968 F.2d at 1024-25.

[2] The dissent suggests that the statements in Plaintiff's verified complaint are not conclusory because they have "the same force and effect as an affidavit." Dissent at 2 n.2. Regardless of their form, the statements remain conclusory.

- 10 -

Smith, 853 F.2d 789, 792-93 (10th Cir. 1988).

It should be no surprise that Plaintiff's response was inadequate given the complexity of the issue presented. Indeed, the requirement that the nonmovant specifically reference facts in its motion materials and the record is of special importance in an employment discrimination case. Unlike the archetypical automobile accident, these cases typically involve numerous incidents over long periods of time, numerous documents (including elaborate policies, handbooks, and manuals), and lengthy depositions of the plaintiff, supervisor, managers, fellow employees, and physicians. Thus, where the burden to present such specific facts by reference to exhibits and the existing record was not adequately met below, we will not reverse a district court for failing to uncover them itself. See Celotex, 477 U.S. at 323; Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996); Thomas, 968 F.2d at 1024-25; Downes v. Beach, 587 F.2d 469, 472 (10th Cir. 1978).

Consider that in this case, aside from the twenty-six pages of evidentiary material submitted by Plaintiff, there were already approximately eight hundred pages of text in the record. The district court has discretion to go beyond the referenced portions of these materials, but is not required to do so. See Downes, 587 F.2d at 472. If the rule were otherwise, the workload of the district courts would be insurmountable and summary judgment would rarely be granted.

Furthermore, although this court has discretion to more broadly review the record on appeal, we, like the district courts, have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it.    See Thomas , 968 F.2d at 1025;  Downes , 587 F.2d at 471-72 (quoting    Bushman Constr. Co. v. Conner , 307 F.2d 888, 892-93 (10th Cir. 1962)).

In short, the nonmovant must carry its burden in the district court in a timely fashion pursuant to Rule 56(e) and     Celotex  or explain why it cannot pursuant to Rule 56(f).    See Fed. R. Civ. P. 56(e), (f).  Otherwise, the nonmovant acts, or fails to act, at its peril.  The burden is not an onerous one for the nonmoving party in each case, but does not at any point shift from the nonmovant to the district court.    See id.

II.  Hostile Work Environment Sexual Harassment

Plaintiff argues that she was subjected to sex discrimination at the Wal-Mart Distribution Center.  Title VII's  prohibition of employment discrimination based on sex encompasses hostile work environment sexual harassment.    See 42 U.S.C. § 2000e-2(a)(1);   Hirschfeld v. New Mexico Corrections Dep't    , 916 F.2d 572, 575 (10th Cir. 1990).  This harassment occurs where "[sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work

performance or creating an intimidating, hostile, or offensive working environment." Meritor Sav. Bank, F.S.B. v. Vinson, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a)(3) (1985)). To form the basis of a claim, the sexual harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Id. at 67 (alteration in original) (quoting Henson v. City of Dundee, 682 F.2d 897, 902 (11th Cir. 1982)). Based on the totality of the circumstances, the environment must be perceived both subjectively and objectively as abusive. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993); Smith v. Northwest Fin. Acceptance, 129 F.3d 1408, 1413 (10th Cir. 1997). We dispose of this claim based on the absence of employer liability, rendering the issue of the presence of a hostile work environment immaterial for the purposes of appeal. See Jenson v. Kimble, 1 F.3d 1073, 1080 (10th Cir. 1993).

A.  Employer Liability

The Supreme Court in Meritor declined to issue a "definitive rule on employer liability" for sexual harassment, but observed that Congress's definition of "employer" in Title VII includes any "agent" of an employer. Meritor, 477 U.S. at 72 (citing 42 U.S.C. § 2000e(b)). The Court concluded based on this

definition that Congress intended the courts to "look to agency principles for guidance in this area." Id. Congress concomitantly intended that there be some limits on employers' responsibility for sexual harassment by its employees. See id.

In accordance with Meritor, this court has identified three alternative bases drawn from agency principles for holding an employer liable for hostile work environment sexual harassment. See Hicks v. Gates Rubber Co., 833 F.2d 1406, 1417-18 (10th Cir. 1987). These are (1) where the acts are committed by an employee acting "within the scope of [his or her] employment"; (2) where the employer was negligent or reckless; or (3) where the employee purported to act or to speak on behalf of the employer and there was reliance upon apparent authority, or the harasser was aided by the agency relation. Id. (quoting Restatement (Second) of Agency § 219(1), (2)(b), & (2)(d) (1958)).

The basis for employer liability alleged in this case is Wal-Mart's negligence in allowing fellow employees to engage in sexual harassment. "Under this theory of employer liability, the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1444 (10th Cir.) (internal quotation marks omitted) (citation omitted), petition for cert. filed, 66 U.S.L.W. 3137 (1997). We have also said in

- 14 -

this context that employer negligence is "'failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.'" Hirschfeld , 916 F.2d at 577 (quoting EEOC v. Hacienda Hotel , 881 F.2d 1504, 1516 (9th Cir. 1989)); see 29 C.F.R. § 1604.11(d). [3] This is not derivative liability according to the doctrine of respondeat superior, but direct liability for negligence. See Hirschfeld , 916 F.2d at 577 n.5. Because an employer is only potentially liable for negligence in remedying and preventing harassment of which it negligently failed to discover, courts must make two inquiries: first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment.

1. Knowledge

An employer is only obligated to respond to harassment of which it actually

---

[3] This EEOC guideline states:

With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

29 C.F.R. § 1604.11(d) (1997).

knew, or in the exercise of reasonable care should have known. See id. at 577. Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees. See Swentek v. USAir Inc. , 830 F.2d 552, 558 (4th Cir. 1987). Regarding constructive knowledge, many courts have held that the pervasiveness of sexual harassment can properly lead to an inference of knowledge. See, e.g. , Baker v. Weyerhaeuser Co. , 903 F.2d 1342, 1346 (10th Cir. 1990); Swentek , 830 F.2d at 558; Katz v. Dole , 709 F.2d 251, 255 (4th Cir. 1983). This is, however, mere application of the negligence standard: highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees.

In judging Wal-Mart's knowledge in this case, the incidents of harassment fall into two categories: (1) those which Plaintiff reported to either Mr. Larson or Mr. Kirchmeier, or both, and (2) those which Plaintiff either did not report, or which she may have reported but respecting which she could not recall any date, content, or recipient. Regarding the first category, Mr. Kirchmeier was a management-level employee of Wal-Mart in that he was maintenance manager and had authority to hire, fire, and formally discipline employees. Mr. Larson was a low-level supervisor, but also a management-level employee for our purposes because he was titled "supervisor" and had some authority over Plaintiff, and many of her coworkers, and reported to Mr. Kirchmeier. See 29 C.F.R. §

- 16 -

1604.11(d). Thus, the incidents of which Plaintiff told either Mr. Kirchmeier or Mr. Larson, or both, put Wal-Mart on actual notice and triggered Wal-Mart's obligation to respond. The incidents in this category, viewing the evidence in the light most favorable to Plaintiff, which she adequately brought to the attention of the district court were: the December 1993 and January 1994 incidents regarding floor employees, the December 1993 or January 1994 incidents involving Mr. Zalaznik, the March parking lot incident, the August 14 incidents, and the November incidents. We analyze the adequacy of Wal-Mart's responses to these incidents below.

In the second category are various additional incidents of harassment which Plaintiff alleged in her verified complaint. Viewing the evidence in the light most favorable to Plaintiff, we consider these to have occurred; however, she failed to reference for the district court specific facts evidencing knowledge of these incidents on the part of Wal-Mart's management-level employees. Apart from her arguments analyzed below, she did not report any of these additional incidents to Mr. Kirchmeier, see I Aplt. App. at 195-96, and she cannot recall the content, supervisory recipient, or date of any other complaints, see, e.g., I Aplt. App. at 237-40.

Plaintiff argued below that Wal-Mart had knowledge of and failed to respond to an incident in January 1994 when Mr. Zalaznik called Plaintiff a

- 17 -

"tramp," because it was in front of Mr. Trauernicht, "who <u>later</u> became a supervisor who did nothing." II Aplt. App. at 773 (emphasis added). This not only did not help to carry Plaintiff's burden on summary judgment, but bordered on the frivolous.

Plaintiff also argued that Wal-Mart had knowledge of an incident in which Mr. McFarland made a sexual comment in the break room in the presence of Mr. Trauernicht. If Mr. Trauernicht were a hourly supervisor at that time, Plaintiff would have had an argument that Wal-Mart was obliged to respond to this incident but did not. Plaintiff, however, did not specify for the district court when this incident occurred or when Mr. Trauernicht became a supervisor. <u>See</u> I. Aplt. App. at 238. She therefore made only an unsupported allegation and failed to carry her burden on this point. Regardless, our review of the record shows that she does not recall when this incident occurred or when he became a supervisor, nor does the record at any place show when he became a supervisor.

Plaintiff argues on appeal that she reported harassment to Jeff Schwartz, an hourly supervisor outside of her department. Plaintiff did reference for the district court her deposition evidencing she complained to Mr. Schwartz about Mr. Berwick and Mr. McFarland, <u>see</u> I. Aplt. App. at 230, but she stated also in her deposition testimony that she did not "remember when or exactly what was said," I Aplt. App. at 240. As noted above, quick and effective action was taken

when Plaintiff complained to Mr. Larson. Vague, conclusory statements do not suffice to create a genuine issue of material fact.

In addition, Plaintiff argues on appeal that her receipt of a Step One disciplinary action after reporting the August 14 harassment made her reluctant to report additional incidents. Plaintiff did not specifically reference evidentiary material to support this argument in the district court. Regardless, all of the unreported incidents at issue occurred before this mid-September 1994 disciplinary action. Plaintiff does not allege the occurrence of any incidents of harassment at all between September and the reported November incidents. Thus, according to Plaintiff, there were no incidents to report which any fear of retaliation could have suppressed. Moreover, Plaintiff was informed that her discipline was for her participation, not for the reporting of harassment. [4]

---

[4] Respecting our statement as to why Mr. Clauser verbally coached Plaintiff, the dissent charges us with neglecting the relevant standard of review as well as unspecified contrary evidence cited to the district court,. See Dissent at 8-9. Mr. Clauser testified that he coached Plaintiff because (1) "she had told one of the mechanics he had a 'cute butt,'" (2) "[s]he had told another associate that she wasn't wearing panties or she didn't wear panties," (3) she commented apparently when choking on some food, "I haven't learned to suck and swallow yet," and (4) she made comments "about fabricating a false sexual harassment claim against her manager." II. R. 490-93, cited in Memorandum Brief in Support of Defendant's Motion for Summary Judgment, I R. 31. Plaintiff referenced no evidence in contravention of these bases for her verbal coaching.

We do not perceive the significance, as the dissent does, of whether Plaintiff's comments about false harassment charges were in jest, as we think it within the employer's discretion to verbally coach Plaintiff for discussing matters that are inappropriate even as material for humor. See Dissent at 9.

Plaintiff also argues that Mr. Kirchmeier's comment, relayed to her by Mr. Larson, that if the problem continued he might fire them all explains her failure to report additional incidents of harassment. Plaintiff did not raise and support this argument below, resulting in waiver. See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 721 (10th Cir. 1993); 10th Cir. R. 28.2(b). Regardless, this isolated remark, assuming its admissibility, is simply not enough to support a reasonable inference that Plaintiff feared retaliation. Such an inference, based on the record, could only be the result of speculation. Moreover, the uncontroverted evidence compels a contrary inference. Mr. Kirchmeier had gone to all area managers after Plaintiff's January complaint and protected her from further harassment from workers off the floor. He and Mr. Larson disciplined Mr. Zalaznik and required him to apologize to her after the March complaint. Furthermore, according to her deposition testimony, Plaintiff knew Wal-Mart would not tolerate sexual harassment, and Mr. Kirchmeier reminded her when he checked with her periodically that her job was not in jeopardy.

Finally, Plaintiff argues that her harassment by coworkers was so pervasive that Wal-Mart's knowledge should be inferred. It would be illogical to require for this inference only the level of pervasiveness essential to make out a hostile environment claim. If this were the rule, knowledge would be attributed to employers in all cases of hostile environment founded on pervasiveness. Still, an

adequate showing of pervasiveness may result in an inference of knowledge, but Plaintiff failed to alert the district court to sufficient specific facts to support such a finding. See Baker, 903 F.2d at 1346 ("[I]t is only when [the incidents] are so egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failure to discover what is going on . . . .") (quoting Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1422 (7th Cir. 1986)). Instead, Plaintiff made only conclusory statements in her verified complaint and brief below about Wal-Mart's knowledge, which do not help her to carry her burden on summary judgment. See Thomas, 968 F.2d at 1024; Conaway, 853 F.2d 792-93. This is particularly true where, as here, the plaintiff was assuring a management-level employee throughout the relevant period that everything was fine. See I. Aplt. App. at 195-96.

None of the above arguments show Plaintiff came forward with sufficient specific facts below evidencing knowledge on the part of Wal-Mart of any incidents in the second category. As a result, for purposes of the ruling on summary judgment, Wal-Mart had no obligation to respond to these incidents.

2. Employer Response

Plaintiff argues Wal-Mart responded inadequately to harassment of which it knew or should have known. This court has not yet enunciated a definitive test to

- 21 -

measure an employer's response to hostile work environment sexual harassment. The relevant overarching doctrine drawn from principles of liability for acts of agents is that of negligence. See Hicks, 833 F.2d at 1417-18. Thus, the touchstone for the evaluation of an employer's response under Meritor and Hicks is reasonableness. An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligation by taking appropriate remedial or preventative action. See Meritor, 477 U.S. at 72.

In Hirschfeld, we compared the employer's response to those which our sister circuits have found adequate, focusing on promptness and effectiveness. See Hirschfeld, 916 F.2d at 578. We implied in particular that stoppage of the harassment by the disciplined perpetrator evidences effectiveness, and noted the relevance of this fact in our sister circuits' cases. See id. at 578 (citing Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir. 1989); Swentek, 830 F.2d at 558-59)); cf. Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1002 (10th Cir. 1996). The Ninth Circuit has explicitly held that the reasonableness of an employer response is measured by its ability to stop the harassment from the person disciplined. See Ellison v. Brady, 924 F.2d 872, 882 (9th Cir. 1991).

In accordance with these principles and this court's precedents, we adopt the test employed by some of our sister circuits, asking whether the remedial and preventative action was "reasonably calculated to end the harassment." Ellison,

924 F.2d at 882; see Knabe v. The Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997); Saxton v. AT & T Co., 10 F.3d 526, 535 (7th Cir. 1993); Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 427 (8th Cir. 1984); Katz, 709 F.2d at 256. A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation. However, this is not the sole factor to be considered. Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist. See Knabe, 114 F.3d at 411-12, 412 n.8.

In cases where effectiveness is not readily evidenced by a stoppage, we consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment. See id. at 414; Saxton, 10 F.3d at 535; Hirschfeld, 916 F.2d at 578; Ellison, 924 F.2d at 882. Courts have explained that simply indicating to a perpetrator the existence of a policy against harassment is usually insufficient. See, e.g., Katz, 709 F.2d at 256. By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination. See Knabe, 114 F.3d at 413; Hirschfeld, 916 F.2d at

578 & n.6;  Swentek , 830 F.2d at 558;  Barrett , 726 F.2d at 427;  cf. Ellison , 924 F.2d at 882 (citing E.E.O.C. Compliance Manual (CCH) § 615.4(a)(9)(iii), ¶ 3103, at 3213 (1988)).

The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective.  Repeat conduct may show the unreasonableness of prior responses.  On the other hand, an employer is not liable, although a perpetrator persists, so long as each response was reasonable.   It follows that an employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to the end the harassment.    See Hirschfeld , 916 F.2d at 579 n.6. ("While there may be egregious cases where such action is the only option for an employer, in less serious cases a reprimand, brief suspension, or other remedial steps may be sufficient to remedy the situation.");    see also  Knabe , 114 F.3d at 414;  Ellison , 924 F.2d at 882;  Barrett , 726 F.2d at 427.

Unfortunately, some harassers may simply never change.  Just as unfortunate, a victim may have to suffer repeated harassment while an employer progressively disciplines the perpetrator to determine whether he or she is just such a "hard head" case.  It is some consolation for the victim that, to be

reasonable, responses must progress more rapidly in proportion to more serious and frequent harassment. The courts, however, must balance the victim's rights, the employer's rights, and the alleged harasser's rights. If our rule were to call for excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination.     See Knabe , 114 F.3d at 414 n.12.

Plaintiff did not bring to the trial court's attention sufficient evidence to establish the essential element for employer liability that Wal-Mart inadequately responded to incidents of harassment of which it knew or should have known. On the contrary, the record shows that Wal-Mart's responses to each incident of which it had actual or constructive knowledge were prompt and either effective or proportional to the seriousness and frequency of the incidents, and therefore were reasonably calculated to end the harassment. Wal-Mart's responses utilized all of the measures provided above as examples which the law aims to encourage employers to utilize.

In January, after Mr. Kirchmeier learned of comments from workers off the floor, but Plaintiff would not disclose names, Mr. Kirchmeier could not discipline individual harassers. Notwithstanding this handicap, his response ended the harassment from these employees.    See I Aplt. App. at 195. Plaintiff came forward with no evidence that Wal-Mart unduly delayed in responding to her

report. Wal-Mart's response was prompt and its effectiveness shows it was reasonably calculated to end the harassment. Moreover, Mr. Kirchmeier then began asking Plaintiff periodically whether she was experiencing any problems.

After the December 1993 or January 1994 comments from Mr. Zalaznik, Mr. Larson had him apologize to Plaintiff. Plaintiff argues that this response was inadequate as evidenced by Mr. Zalaznik's repeat conduct in March. We do not consider Wal-Mart's response inadequate for several reasons. Mr. Zalaznik's March comment was in response to Plaintiff's teasing. His comment was not temporally proximate to the prior incident, but two to three months later. Finally, his comment was not made on the clock in the workplace, but off the clock and in the parking lot. These factors are important because "whether a particular action or incident establishes a purely personal, social relationship without a discriminatory employment effect" or constitutes sexual harassment depends upon the totality of the circumstances, including the nature of the conduct and its context. See Discrimination Because of Sex Under Title VII of the Civil Rights Act of 1964, as Amended; Adoption of Interim Interpretive Guidelines, 45 Fed. Reg. 25,024 (1980) (codified at 29 C.F.R. § 1604.11); 29 C.F.R. § 1604.11(b).

That Mr. Zalaznik regressed over a period of three months does not necessarily mean Wal-Mart's initial response was unreasonable. This was the first reported incident involving Mr. Zalaznik, so that Wal-Mart would not know

what degree of discipline would be severe enough to deter him. Plaintiff failed to come forward with any evidence that Mr. Larson's response was unduly delayed. Thus, although Mr. Zalaznik ultimately required more severe discipline to subjectively deter him, we cannot say under the circumstances that Wal-Mart's response to these incidents was disproportionate to the seriousness and frequency of the harassment and thus unreasonable. See Knabe, 114 F.2d at 413 (holding under similar but more serious circumstances that counseling on policy without actual discipline was adequate response).

Following the March parking lot incident, Mr. Larson's response ended the harassment from Mr. Zalaznik. See I Aplt. App. at 265. Wal-Mart did not vainly hope the same discipline as before would be effective, but made this discipline progressively more severe. Mr. Larson considered even more severe discipline inappropriate for this incident because both employees were off the clock and in the parking lot, and we think this consideration reasonable. Mr. Larson's response was prompt and progressively more severe, and its effectiveness indicates that it was reasonably calculated to end the harassment.

After Plaintiff reported the August 14 harassment, Mr. Clauser began investigating within a day and disciplined both harassers for all discovered incidents. After Wal-Mart's response, Plaintiff testified that Mr. Berwick and Mr. McFarland "stayed away from me and they didn't look at me." See I Aplt.

App. at 278-79.  In addition, Mr. Kirchmeier offered Plaintiff a promotion to forklift mechanic, in part to put her on a schedule giving her the least possible contact with Mr. Berwick and Mr. McFarland.  Wal-Mart's response to the previously undiscovered incidents was not unduly delayed because Plaintiff's complaints were untimely.  Wal-Mart's responses to these incidents were prompt and the stoppage shows they were reasonably calculated to end the harassment.

After receiving reports of the November incidents, Mr. Clauser immediately interviewed Mr. Runyon and Mr. Medina, who was thought to be the Larry involved in the November 9 incident. [5]  Mr. Medina denied his involvement, and Plaintiff could not provide the full name of her alleged harasser.  Mr. Clauser attempted to corroborate her story that Mr. Medina had harassed her, but was unable to do so.  Mr. Clauser went ahead and counseled Mr. Medina on Wal-Mart's sexual harassment policy, but did not otherwise discipline him.  This response was reasonable under the circumstances.  See Knabe, 114 F.2d at 413 (holding under similar but more serious circumstances that counseling on policy without actual discipline was adequate response).  It would be unreasonable, and

_____

[5]  According to the dissent, whether Mr. Medina was the actual harasser is an issue for the trier of fact.  See Dissent at 10.  In light of Mr. Medina's denial, Plaintiff's failure to recall the actual harasser's name, and the lack of any witness, no evidence from which a reasonable jury could have inferred Mr. Medina was the actual harasser was adduced.  Genuine issues of fact must be supported by more than a mere scintilla of evidence.  See Anderson, 477 U.S. at 252; Black v. Baker Oil Tools, Inc., 107 F.3d 1457, 1460 (10th Cir. 1997).

callous toward Mr. Medina's rights, for the law to require Wal-Mart to discipline Mr. Medina for events he denies, of which Wal-Mart could not find evidence, especially when the complainant cannot specifically identify the harasser. Moreover, there is no evidence that there was any subsequent harassment by Mr. Medina. Although Plaintiff only worked at the center one more day, there was no evidence to support an inference that she would have suffered further harassment by Mr. Medina had she worked longer. See Knabe, 114 F.3d at 413-15. Thus, Plaintiff has not met her burden to set forth specific facts showing that Wal-Mart's response to this report was lacking--either unduly delayed or ineffective.

Mr. Clauser disciplined Mr. Runyon in writing and counseled him on Wal-Mart's sexual harassment policy. Plaintiff argues on appeal that Mr. Runyon made light of her complaint the next day, evidencing the inadequacy of Wal-Mart's response. She did not, however, allege this incident in her verified complaint, nor did she refer the district court to any evidence of this allegation. Consequently, from the point of view of the district court, harassment by Mr. Runyon stopped after Mr. Clauser counseled him, evidencing that Wal-Mart's response was reasonable. Moreover, Plaintiff came forward with no evidence that would support an inference that she would have suffered further harassment by Mr. Runyon if she had worked at the center longer. See Knabe, 114 F.3d at 413-15.

Plaintiff argues that the district court applied the wrong law by considering responses adequate because they stopped the harassment by the disciplined harasser, even though others harassed in the future. The Ninth Circuit has held that in measuring the reasonableness of an employer response a court may consider whether other potential harassers are deterred.  See Ellison , 924 F.2d at 882. We also think this fact relevant, but Plaintiff came forward with no evidence in the district court that any future harasser knew of, or was at all motivated by, any prior Wal-Mart response. Without evidence of such a nexus between a prior response and later harassment by others, the later harassment is irrelevant to the adequacy of the prior response. Thus, based on the materials to which Plaintiff directed the district court's attention, all known harassment was unconnected to any prior responses and stopped as a result of Wal-Mart's remedial and preventative actions.

The dissent does not seem to quarrel with this nexus requirement, but suggests that the result in this case should be different because circumstantial evidence can be enough.  See Dissent at 14-15. Irrespective of what sort of evidence could have been sufficient, the record in this case is complete and Plaintiff failed to submit any evidence, direct or circumstantial, indicating that the nature of any prior Wal-Mart response bore any relationship whatsoever to any future harassment.

For the dissent, the mere occurrence of the future harassment is enough circumstantial evidence to draw an inference of the inadequacy of prior employer responses. Whether even the immediate firing of each harasser would have actually deterred future wrongdoers is purely speculative, and factually impossible if the future harassers did not know about those actions. Unless we hold employers strictly liable for failing to broadcast sensitive disciplinary matters to their entire workforces, we cannot predicate liability on this theory. In addition, if the dissent's inference is properly drawn on this record, it would be so in every case involving multiple incidents of harassment, and employers would be hard pressed to prove the negative--that future harassers were not motivated by prior employer responses. [6]

We recognize the sensibility of taking measures to prevent sexual

---

[6] The dissent cites Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23 (1993), and Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1002 (10th Cir. 1996), for the proposition that the focus should be on whether there were recurrent incidents of harassment, rather than on effectiveness in stopping the disciplined harasser. See Dissent at 13. Neither authority supports the stated proposition. The cited discussion in Harris rejects psychological injury as an essential element of a Title VII claim. See Harris, 510 U.S. at 20-23. The Winsor court does find the employer's remedial action plainly ineffective based on continuing harassment, but this was continuing harassment by previously complained-of harassers, which the employer did not reprimand or discipline in any way. See Winsor, 79 F.3d at 1002. Significantly, the Winsor court cites Hirschfeld for comparison, noting parenthetically that in that case the employer's discipline "of offender" was expeditious and effective. Winsor, 79 F.3d at 1002 (citing Hirschfeld, 916 F.2d at 578 & n.6.) (emphasis added).

- 31 -

harassment in the first instance, although such measures are not mandatory. See 29 C.F.R. § 1604.11(f) (1997); Meritor, 477 U.S. at 73; 3 Lex K. Larson, Employment Discrimination § 46.07[4][a] (2d ed. 1997). The dissent's test, however, would make employers insurers against future sexual harassment by coworkers after an initial employer response, regardless of the nature of the response taken. This is liability without end.

III. Intentional Infliction of Emotional Distress Claim

Plaintiff argues that her emotional distress claim is not preempted by the Colorado Worker's Compensation statute. The district court, however, rested its summary judgment ruling alternatively on the ground that Plaintiff came forward with insufficient evidence of vicarious liability. In her opening brief, Plaintiff makes only two assertions, without citation to authority or the record, that the doctrine of respondeat superior should not protect Wal-Mart. She also makes just one assertion, again without citation to authority or the record, that a question of fact remains on this issue. Arguments inadequately briefed in the opening brief are waived, see Fed. R. App. P. 28 (a)(6); Coleman v. B-G Maintenance Mgmt. of Colo., Inc., 108 F.3d 1199, 1205 (10th Cir. 1997); United States v. Callwood, 66 F.3d 1110, 1115 n.6 (10th Cir. 1995); Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995), and bald assertions in briefs that there are genuine

- 32 -

issues of material fact are insufficient to merit reversal of summary judgment.

See Fed. R. Civ. P. 56(e); Thomas , 968 F.2d at 1024.

AFFIRMED.

No. 97-1026, Adler v. Wal-Mart Stores, Inc.

BRISCOE, Circuit Judge, concurring and dissenting:

I agree with the majority's disposition of the outrageous conduct claim, but respectfully dissent from its affirmance of summary judgment in favor of Wal-Mart on Adler's Title VII sexual harassment claim. There is substantial support in the record for Adler's claim that she was subjected to continuous sexual harassment by multiple Wal-Mart employees over a period of several months and that Wal-Mart's response to the harassment was not prompt and effective. In granting summary judgment, the district court concluded as a matter of law that an employer's remedial measures are effective when they cause individual harassers to stop, without regard to whether the measures are effective in deterring future harassment by others. I disagree with that legal conclusion and would reverse the summary judgment entered in favor of Wal-Mart on Adler's sexual harassment claim.

The majority concludes Adler failed to carry her burden in responding to Wal-Mart's motion for summary judgment by failing to establish any issue of disputed material fact. In ruling against Adler, the majority limits its review of the record to only those pages specifically cited by Adler to the district court, ignoring the pages cited by Wal-Mart to the district court. By refusing to consider evidence cited by Wal-Mart, the majority ignores the burden of the party moving for summary judgment to show the absence of material questions of fact. See Kaul v. Stephens, 83 F.3d 1208, 1212 (10th Cir. 1996). Wal-Mart submitted the complete depositions of Adler, Berwick, McFarland,

Clauser, and Kirchmeier and specifically referred the district court to over 100 pages from those depositions.[1] Between them, the parties specifically referred the court to 121 pages from depositions, several deposition exhibits, and Adler's verified complaint.[2] In assessing Adler's response to the motion for summary judgment, we must consider at a minimum all of the evidence specifically cited to the district court by both parties.

The majority's rigid application of a technical procedural rule to avoid deciding a claim on the merits is contrary to the purpose underlying modern rules of procedure. This court has long recognized the "ends of justice are not served when forfeiture of just claims because of technical rules is allowed." Travelers Indemnity Co. v. United States, 382 F.2d 103, 105 (10th Cir. 1967). As we explained in Denver & Rio Grande Western Railroad Co. v. Union Pacific Railroad Co., 119 F.3d 847, 848-49 (10th Cir. 1997), "case law interpreting [procedural] rules is founded upon a policy which favors deciding cases on the merits as opposed to dismissing them because of minor technical defects."

Adler's sexual harassment claim is factually supported in the evidence cited to the

_____

[1] There is no indication in the court's ruling that it looked only at record pages specifically cited by the parties. The District of Colorado has no local rule requiring parties to refer with particularity to those portions of the record on which they rely in support of or in opposition to motions for summary judgment. For all we know, the court reviewed the complete depositions as the record was not massive.

[2] The statements in the verified complaint are not, as the majority asserts, conclusory allegations. A verified complaint stating facts that would be admissible at trial and that are based on plaintiff's personal knowledge has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. See Conaway v. Smith, 853 F.2d 789, 792 (10th Cir. 1998).

district court. In reviewing the district court's grant of summary judgment, we must view the factual record and reasonable inferences drawn from it in the light most favorable to the party opposing summary judgment. Kaul, 83 F.3d at 1212. The evidence is sufficient to establish Adler, the first woman in her department, was subjected to recurring sexual harassment by multiple Wal-Mart employees over a period of several months. Despite knowledge that the harassment was a recurring problem involving numerous workers, Wal-Mart failed to take prompt action reasonably calculated to send a message to the workforce as a whole that harassment would not be tolerated.

The majority departs from our standard of review by failing to view the facts in the light most favorable to Adler and by overlooking evidence in her favor. When viewed in the light most favorable to Adler, the evidence presented is sufficient to survive Wal-Mart's motion for summary judgment.

Maintenance manager Kirchmeier expected trouble from Wal-Mart employees when he selected Adler to be a battery room mechanic in October 1993 because she was the first female selected to work in the building and in his department. According to coworker Little, a "lot of people had problems when she was given the battery job, because she was a woman," and they said the only reason she got the job was "because she was a woman, and that she must have done some favors for somebody to get the promotion." App. at 780-81. Soon after she started, floor workers, forklift drivers, and distribution break pack workers began making "rude comments indicating that she had to

perform acts to get the job." Id. at 688. It can reasonably be inferred the favors and acts referred to were sexual in nature. Kirchmeier stopped the initial outbreak of harassment by announcing to the supervisor of the forklift drivers that he would not permit lift drivers to bring their vehicles in for maintenance if the harassment continued. He then regularly asked Adler if she was being harassed.

In December 1993, coworker Zalaznik offered to perform electrical work at Adler's home in exchange for oral sex. Wal-Mart denied receiving any reports of harassment in December or January, but Adler testified she reported it to her immediate supervisor Larson. In January 1994, Zalaznik, in the presence of coworkers McFarland and Berwick, accused Adler of engaging in oral sex with Kirchmeier to obtain her job. Zalaznik also made another crude sexual suggestion to Adler in January. According to Adler, she again reported Zalaznik's conduct to Larson and reported it to Kirchmeier when he asked her if she was being harassed. However, Kirchmeier did not recall reports of harassment in January. According to Adler, Larson told her Kirchmeier was going to fire all of them if they did not get along, and Adler became reluctant to report harassment to Kirchmeier.[3]

_____

[3] Unlike the majority, I see no hearsay problem with this statement. It is immaterial whether Kirchmeier actually told Larson that Adler's job was in jeopardy. What matters is that Larson told her Kirchmeier said her job was in jeopardy. The statement is important not for the truth of the matter asserted but for the fact that Larson made the statement to Adler, thereby making her reluctant to report harassment.

In March 1994, Zalaznik made another crude sexual suggestion to Adler in the parking lot after work. He called her a tramp the next day at work. Adler did report the comments to Larson and was told initially there was nothing Wal-Mart could do about the harassment because it did not occur on company time. Larson reported the incident to Kirchmeier because he was unsure what to do since it occurred off the clock. Kirchmeier understood that Larson told Zalaznik to "[k]nock this stuff off." App. at 700. Zalaznik was given a verbal warning but was not formally written up because the harassment did not occur on company time. Adler testified that Zalaznik stopped making sexual remarks to her.

Kirchmeier testified: "I did, again, stress to the entire department that we would not accept inappropriate behavior, conduct, or comments to anyone." "I did it continuously." App. at 701. While this shows Kirchmeier tried to end the harassment, it also shows he perceived the problem as a recurring one involving many employees.

Despite Kirchmeier's efforts, Adler was subjected to continuous harassment by McFarland and Berwick. She stated that "continuously through 1994," and "[e]very time I was around him," McFarland made sexually suggestive comments, App. at 192-93, and Berwick "grabbed my waist several times as he has walked by me." Id. at 807. Adler testified that Berwick and McFarland "have both, many times, taken anything from hammers to broomsticks and put them between their legs, call[ed] my name, then stroke[d] the handle." Id. It can reasonably be inferred there were too many incidents

with Berwick and McFarland for Adler to specifically recount all of them. At some point, another coworker she knew as Tony made unwanted sexual advances toward her and told her he would deny it if she told anyone.

Adler told "most of the guys in the maintenance department," App. at 231, about the ongoing harassment by Berwick and McFarland, and named several coworkers she had told. She also told cleaning supervisor Schwartz about the ongoing harassment. She reported the constant harassment to Trauernicht after he became a supervisor and Trauernicht witnessed one of the comments by Berwick. Although Adler could not recall exactly when this occurred, she knew it was after Trauernicht became a supervisor because she recalled another worker told her he was surprised Trauernicht did nothing about it. The majority departs from our standard of review by viewing this evidence in a light unfavorable to Adler and concluding she did not present any evidence that Trauernicht was a supervisor when he heard the comment. The determination of credibility and the weighing of evidence are not our function in reviewing a summary judgment. See Kaul, 83 F.3d at 1212. Whether Trauernicht was a supervisor when he heard the comment was a question of material fact.

Adler testified that Larson "heard a lot of the comments" by McFarland and at least one comment by Berwick. App. at 232. She also testified, "I'm sure I mentioned it [to Larson] after the August deal and I'm sure I mentioned it before," although she did not recall exactly when. Id. at 233. Adler could not recall exactly what comments she

reported, but she recalled that she complained generally about sexual comments. She "indicated that [she] wanted it to stop, and [she] was more demanding after August of '94." Id. at 237. The majority holds Adler to an unrealistically high standard of precise recall and departs from our standard of review by improperly weighing this evidence and concluding it has no evidentiary value. Whether Adler's supervisors were aware of the ongoing harassment was a question of material fact. Thus, the record established for purposes of summary judgment that, despite the knowledge of three supervisors and many coworkers, Wal-Mart did nothing about the constant, ongoing harassment until Adler formally reported the culminating incident on August 14.

There was no supervisor at work on Sunday, August 14. According to Adler, the incident began when Berwick and McFarland shook a bottle of baby powder at her and said they were going to powder her bottom. She got back at them by soaking their cart seats. McFarland telephoned Adler, telling her to meet them in the parts room for sex. She was so frightened she tried to hide. When she encountered the two while she was driving a forklift, Berwick, with McFarland's encouragement, suggested they have sex on the forklift. He climbed on, wrapped his leg around her, and made thrusting motions against her. Adler pushed him off. According to Berwick and McFarland, Adler started the forklift incident by telling them she had a sexual fantasy about having sex on a forklift and her body language indicated she was inviting Berwick to get on the lift with her. McFarland stated Berwick did not wrap his leg around Adler, described the incident as a

joke, and said that Adler continued to engage in horseplay with them by soaking their cart seats. Contrary to our standard of review, the majority accepts the sequence of events as related by Berwick and McFarland. The only horseplay Adler admitted was soaking their cart seats before the forklift incident. Coworker Goeppinger testified Adler was upset that day and told him about the incidents and that she was so frightened she tried to hide.

Adler reported the incidents to Larson. Kirchmeier also learned of the incidents and Adler met with Kirchmeier and Personnel Director Clauser. Clauser described Adler as serious and upset. She gave a written statement which described some of the earlier harassment by Berwick and McFarland as well as the August 14 incidents. Clauser interviewed ten people.

Following Clauser's investigation, Adler was disciplined on September 15, 1994, with "verbal coaching," the lowest level of discipline practiced by Wal-Mart, for making inappropriate sexual comments *unrelated to the August 14 incidents* and for joking about fabricating a sexual harassment claim against Kirchmeier. Adler told Clauser she had been approached by a coworker about fabricating a sexual harassment claim. The coworker said, "Why don't you do us all a favor and take Jesse out on sexual harassment." Adler responded, "I don't think you have enough money to do that." The worker said, "How much do you want?" or "We can get you enough to retire on," and she replied, "No, you couldn't get that much money." App. at 491. Viewed in the light most favorable to Adler, the evidence shows Adler regarded the exchange as a joke. Clauser

-8-

conceded it was probably in jest but felt discipline was justified because he considered it inappropriate to joke about falsely accusing someone of sexual harassment.

Contrary to our standard of review, and contrary to evidence cited to the district court, the majority states the record shows Clauser found Adler participated in *the* joking with Berwick and McFarland, presumably the horseplay and sexual banter McFarland said Adler participated in on August 14. The majority also states Clauser learned Adler had "discussions" with coworkers about making a false sexual harassment claim against Kirchmeier, overlooking deposition pages cited to the district court showing even Clauser considered the discussions to be in jest.

When interviewed by Clauser, Berwick denied the whole incident. McFarland admitted some of it, but minimized its seriousness and stated Adler willingly participated. Berwick and McFarland were disciplined for the August 14 incidents. McFarland was given "a verbal coaching/reprimand" for inappropriate sexual remarks, and Berwick was given a "decision-making day," a one-day *paid* suspension for inappropriate sexual gestures, dishonesty about the incidents, and safety violations.

It can reasonably be inferred the discipline imposed was not widely known in the company because not even Adler knew they had been disciplined. Although Berwick and McFarland stopped harassing her after Clauser's investigation, Adler still did not know at the time of her deposition what discipline they had received. It could also be reasonably inferred the discipline was ineffective in deterring potential harassers because Medina

harassed Adler on November 9 by inappropriately running his hand down her back to the tailbone while trying to convince her to adjust his lift so it would go faster. The majority views this incident in a light unfavorable to Adler, suggesting Medina was only thought to be the harasser. This is a question for the trier of fact. Coworker Runyon, generally known as Moe, harassed Adler on November 12 by running his fingers through her hair and on the back of her neck while discussing service for the forklift he was operating.

Adler reported the two incidents to Larson, she prepared a written report, and Clauser investigated. Medina was not disciplined because there was no independent witness to the incident. There was an independent witness to the Runyon incident and Runyon also admitted the incident. He was "coached," i.e., written up, rather than punished with a disciplinary step. A few days later, Kirchmeier told Adler the problem had been solved, but on November 19, Runyon came over to where Adler was working and said he would love to run his fingers through her hair again. She told Larson, who "made [Adler] feel like a big baby, . . . like [she] was making a big deal of it." App. at 308. Adler went on leave of absence that day and never returned to work.[4] She wanted a different job at Wal-Mart and Kirchmeier offered her a lower-paying position, which she rejected.

The record established for purposes of summary judgment that Adler was

---

[4] Contrary to the majority's assertion, the evidence of Runyon's reaction to Adler's report was cited to the district court. Although Adler did not specifically cite these deposition pages to the district court, the defendant did.

subjected to a sexually hostile work environment by her coworkers. Because the harassment was by her peers rather than by her supervisors, Harrison v. Eddy Potash, Inc., 112 F.3d 1437 (10th Cir. 1997) is inapplicable. The only basis for liability is under Restatement (Second) of Agency § 219(2)(b). See Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 783 (10th Cir. 1995). Generally, an employer is liable for sexual harassment by an employee's peers when its management level employees, agents, or supervisory employees knew or should have known of the harassment and failed to take prompt and effective remedial measures. See 29 C.F.R. § 1604.11(e); Hirase-Doi, 61 F.3d at 783. In addition, an employer will be charged with knowledge of egregious, numerous, and concentrated incidents that add up to a campaign of harassment. See id. at 783-84.

The portions of the record specifically cited to the district court contain substantial evidence that in addition to the reported harassment by Zalaznik and floor workers, Adler was subjected to an eight-month campaign of continuous sexual harassment by Berwick and McFarland. Although Adler did not make a formal report until August, there was evidence cited to the district court that Wal-Mart either knew about it or should have known about it and failed to take prompt remedial action. Adler testified that sometime before the August 14 incidents, Adler told three Wal-Mart supervisors, including Larson, of the ongoing harassment. Some of the incidents were observed by supervisors. The ongoing harassment was also widely known among her coworkers because she told them

about it. It could reasonably be inferred that the campaign of harassment was so constant, went on so long, and was so widely known that reasonably alert management should have learned about it before August 14 and should have done something to stop it before then.

Adler also presented evidence to support her theory that Wal-Mart's response after learning of the harassment was inappropriate. An employer's action is appropriate when it "fully remedies the conduct without adversely affecting the terms or conditions of the charging party's employment in some manner," for example, by transfer to a less desirable location. EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), 3103, 3213 (1988). Employers have a duty to express strong disapproval of sexual harassment and to develop appropriate sanctions. See 29 C.F.R. § 1604.11(f).

When an employee is sexually harassed by one coworker, it is appropriate to measure the effectiveness of the employer's remedial measures by their effect on that one coworker. Measures reasonably calculated to end that coworker's harassment are sufficient. See Hirase-Doi, 61 F.3d at 786. Frequently, however, there are multiple harassers. Where, as here, one woman enters a previously all-male workplace, it is not uncommon for a large segment of the male workforce to sexually harass the female newcomer. See, e.g., Winsor v. Hinckley Dodge, Inc., 79 F.3d 996 (10th Cir. 1996); Carr v. Allison Gas Turbine Div., General Motors Corp., 32 F.3d 1007 (7th Cir. 1994); Waltman v. International Paper Co., 875 F.2d 468 (5th Cir. 1989); Katz v. Dole, 709 F.2d 251 (4th Cir. 1983). When an employee is subjected to recurring sexual harassment by

multiple coworkers, incident-by-incident measures aimed at particular harassers may be sufficient to stop harassment by those individuals but insufficient to deter others. Measures that stop some harassers but do not deter others are small comfort to the victim. Rather than focusing on whether a given individual recurrently harassed the victim, the focus should be on whether the victim was subjected to recurring acts of harassment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23 (1993); Winsor, 79 F.3d at 1002. Particularly in a multiple harasser situation, the reasonableness of an employer's remedial measures must depend on their ability to stop both the past harassment and deter potential harassers. See Ellison v. Brady, 924 F.2d 872, 882 (9th Cir. 1991).

Wal-Mart management had actual knowledge of the first two outbreaks of harassment against Adler--the harassment by floor workers and by Zalaznik. Prompt action by Kirchmeier stopped the harassment by the floor workers. Although Zalaznik stopped harassing Adler after he was counseled, management should have known by this time that harassment of Adler was not a problem with just one particular coworker. Management knew bringing a female into the maintenance shop would cause problems and it knew more than one coworker had harassed Adler. The initial measures that stopped harassment by the floor workers and by Zalaznik were not effective in deterring others. Moreover, Larson deterred Adler from reporting further harassment to Kirchmeier by implying she would be fired if she did not work things out with Zalaznik. Berwick and McFarland were obviously not deterred and committed the most serious

harassment by engaging in an eight-month campaign of constant harassment against Adler.

When management finally took action after Adler had formally reported the August 14 incidents, Berwick and McFarland were disciplined, but Adler was disciplined as well. The discipline given to Berwick and McFarland was not severe and was not widely known among the employees. Not even Adler knew they had been disciplined. Although the remedial measures again succeeded in stopping harassment by the particular harassers, the measures were not effective in deterring others because Medina and Runyon later harassed Adler. Moreover, the response to Adler's report of harassment by Medina and Runyon was not reasonably calculated to end harassment. Runyon regarded the matter as a joke, and Larson indicated to Adler she was making a big deal of it.

Motivation and causation may, of course, be proved by circumstantial evidence. See Ready Mixed Concrete Co. v. National Labor Relations Board, 81 F.3d 1546, 1550 (10th Cir. 1996). The majority, however, would require direct testimony from Runyon and Medina that they knew of and were motivated by Wal-Mart's responses to the harassment by Berwick and McFarland to prove a nexus between their harassment and the prior responses to harassment. This kind of direct evidence is rarely available in a discrimination case and circumstantial evidence is sufficient. Daniel v. Loveridge, 32 F.3d 1472, 1476 (10th Cir. 1994). The circumstantial evidence was sufficient to establish for purposes of summary judgment that the discipline given to Berwick and McFarland

-14-

did not deter Runyon and Medina from harassing Adler. After months of harassment by multiple workers, Wal-Mart did not send a message to the workforce that harassment would not be tolerated. Under these circumstances, it can reasonably be inferred that Medina and Runyon were not deterred by Wal-Mart's prior remedial measures.

After the report of the August 14 incidents, management could justifiably have fired Berwick and McFarland for harassment, thereby sending a clear message to the workforce that Wal-Mart would not tolerate sexual harassment. Short of that, Wal-Mart could have at least gathered the workforce together and told them sexual harassment would not be tolerated and that individuals who continued to sexually harass Adler would be subject to discipline, including termination.

I conclude it is for the trier of fact to determine whether Wal-Mart knew or should have known of the ongoing harassment and failed to take prompt and effective remedial measures. I would affirm the entry of summary judgment on the outrageous conduct claim and reverse the district court's entry of summary judgment on the sexual harassment claim.